1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:   CIVIL TERM : PART 4
----------------------------------------X
RAUL MATOS,

                        Plaintiff,
                                            Index No.
                -against-                   151150/2017

STEPHEN HIRALDO,
                                            JURY TRIAL
                        Defendant.
----------------------------------------X
                            New York Supreme Court
                            60 Centre Street
                            New York, New York 10007
                            September 24, 2021


B E F O R E:

            HON. FRANK NERVO, Justice of the Supreme Court


A P P E A R A N C E S:

KUHARSKI LEVITZ & GIOVINAZZO, ESQS.
Attorneys for the Plaintiff
176 Hart Boulevard
Staten Island, New York 10301
BY: WILLIAM HACKWELDER, ESQ.


ZEITLIN & ZEITLIN, P.C.
Attorneys for the Defendant
50 Court Street, Suite 506
Brooklyn, New York 11201
BY: STEPHEN ZEITLIN, ESQ.







                                    LAURA L. LUDOVICO
                                    SENIOR COURT REPORTER

D_000428

23-01011-jpm   Doc 11-2   Filed 10/27/23   Entered 10/27/23 10:33:02   Exhibit Ex. B
Proceedings [p. A.59-78]      - Trial Transcript   Pg 2 of 124

2
Proceedings

1            THE COURT:  Good morning.

2            Before we bring the jury in and start the trial,

3     there are a number of things that we wanted to put on the

4     record, correct, counsel?

5            MR. HACKWELDER:  Yes, Your Honor.

6            THE COURT:  Which issue would you like to start

7     with, the motions in limine or the motions regarding the

8     proposed verdict sheet and charge?

9            MR. ZEITLIN:  If I could be heard, Your Honor.

10    The first argument that I wish to make, Your Honor, is that

11    the Court has told us in chambers that it was not going to

12    bifurcate this case.  I would ask for the case to be

13    bifurcated.  I think it's prejudicial and this is a small

14    case with serious injuries to be bifurcated and not to be

15    combined.

16           THE COURT:  All right.  In as much as the medical

17    proof in this case is not going to take very long to

18    introduce into evidence, in the interest of judicial

19    economy and clear proof presentation to the jury, your

20    motion is denied.  Of course, you have an exception.

21           MR. ZEITLIN:  Thank you for the exception, Your

22    Honor.

23           If I may go to the next point that we discussed

24    in chambers.  The plaintiff is not calling any medical

25    experts or anybody from a hospital, but has got the

D_000429

3

Proceedings

1   hospital record certified and the Court is allowing that

2   certification of the hospital record to go into evidence in

3   total, but the plaintiff's attorney has asked the Court to

4   redact a portion of the hospital record that indicates that

5   the plaintiff had marijuana and alcohol in his system and

6   the argument by the plaintiff is that could be hearsay.  My

7   argument is if they're not calling any witnesses, having a

8   certified record to go in, the entire record should go in,

9   including any indication of marijuana and alcohol.

10          THE COURT:  All right.  Mr. Hackwelder?

11          MR. HACKWELDER:  Yes, Your Honor.  The case law

12   is clear that hearsay within a certified record has to --

13   there has to be a foundation.  It has to be a clear

14   indication as to the source of the hearsay.  So, for

15   instance, if the hospital record were to say "patient

16   states," then it indicates the source, where the source --

17   it's not clear where the source of the information came

18   from.  The case law is clear that those portions of the

19   record have to be redacted.

20          Counsel kind of misstates that the record shows

21   that he had marijuana and alcohol in his system.  I haven't

22   seen any record that shows he had marijuana or alcohol in

23   his system.  Its reference is to basically giving a history

24   or something to that effect that says alcohol usage, it

25   will say something like occasionally or daily.

4

Proceedings

1            Lastly, Judge, whether or not he had alcohol in

2       his system or marijuana in his system at the time he went

3       to the hospital is irrelevant.  It does not go -- it's

4       irrelevant because he didn't go to the hospital immediately

5       following this incident, so it's not going to show that he

6       was drunk at the time of the incident or that he was high

7       at the time of the incident, that he used drugs at the time

8       of the incident.  He went to the hospital many days later

9       so all that that could possibly show is that he used at

10      some other time, not at the time of the incident.  It

11      doesn't show that he was -- there's no proof that he was

12      under the influence of any drugs or alcohol at the time of

13      the incident, so it's extremely prejudicial to bring that

14      up or have the jurists see it.  So the record should be

15      redacted.  That's what the case law holds.

16            THE COURT:  All right.  The application to redact

17      any reference to alcohol or alcohol use or marijuana use

18      is -- the objection is granted and that will be redacted.

19            Is there any other hearsay in the medical record

20      that concerns anybody at this time?

21            MR. HACKWELDER:  No, Your Honor.

22            THE COURT:  All right.

23            MR. ZEITLIN:  Your Honor, my next point, we

24      discussed the fact that the defendant, Steven Hiraldo, has

25      never been convicted of a crime.  I believe the Court ruled

Proceedings

1    in chambers or said it was going to rule in chambers that

2    the plaintiff would not be able to ask questions regarding

3    any arrest or anything of that nature because there was no

4    conviction of any crime.

5              THE COURT:  Mr. Hackwelder?

6              MR. HACKWELDER:  Yes, Your Honor.  It's

7    plaintiff's position that the evidence of, you know, the

8    criminal charges and what the defendant did plead to, which

9    was a disorderly conduct, should be properly before the

10   jury.  The reason for that is, one, what he -- what he pled

11   to was as a result of this occurrence.  It's not some other

12   crime.  It's not something where, you know, I'm bringing up

13   something that's unrelated to the incident.  What he pled

14   to was as a result of this incident.

15             Second, Your Honor, as far as I know, the file is

16   not sealed, so there's no privilege that attaches that

17   would warrant not allowing him to testify.  And even if it

18   were sealed, Your Honor, that privilege has been waived by

19   the defendant.  Earlier in this case the defendant filed an

20   Affirmation in Opposition to a motion for default judgment.

21   This was filed on December 12, 20 -- December 27, 2017.  In

22   his affirmation in opposition he states in paragraph five:

23   "As mentioned above, my --"

24             THE COURT:  A little slower.

25             MR. HACKWELDER:  I apologize.

A.62

D_000432

6
Proceedings

1          "As mentioned above, my delay in attempting to

2     file an answer was short and there is no prejudice to the

3     plaintiff as a result of my short delay.  I have a

4     meritorious defense in that I dispute that I committed the

5     crimes or caused the injuries alleged.  Contrary to

6     plaintiff's statement in paragraph four of the complaint, I

7     did not plead guilty to an assault, but only to disorderly

8     conduct in New York County Criminal court."  So, Your

9     Honor, that right there waives any privilege as to the

10    unsealing.

11         Second, Your Honor, he didn't have to plead

12    guilty to disorderly conduct.  He could have gone to trial

13    and had he won on trial, he would be allowed to say, look,

14    I went to trial on this, I won, they found that I wasn't

15    guilty.

16         And lastly, Your Honor, I'm not asking that this

17    be collateral estoppel or a directed verdict.  The jury

18    should be allowed to consider it, defense will then be

19    allowed to argue that, no, he still has a defense to the

20    charges of assault or battery.  There's no waiver of that,

21    he can still make the defense.

22         THE COURT:  The Court has reviewed the entirety

23    of the Criminal Court file and determined that the

24    defendant pled guilty to a violation on a 240.20 of the

25    CPLR, which, as we know, is a violation and not a crime.

Proceedings

1    As a result, the Court rules that neither that plea nor

2    anything at all that occurred in Criminal Court or even the

3    fact that there was a Criminal Court action is to be

4    mentioned during the course of this trial.  That includes

5    no reference to the fact that the defendant did perform

6    community service as a result of that agreement for the

7    240.20 or that the defendant remitted any restitution at

8    all, okay?

9            MR. HACKWELDER:  Just two things real quick

10    because I want to make sure that we're clear on this.  Is

11    my client allowed to testify that after this he called the

12    police?

13            THE COURT:  Yes.

14            MR. HACKWELDER:  Okay.  I'm not going to have him

15    go into anything about a criminal complaint.  I just want

16    to make sure that --

17            THE COURT:  It's a permissible fact.

18            MR. HACKWELDER:  And I apologize, I wanted to go

19    back to just the drugs and alcohol reference.  Certainly

20    counsel should be allowed to ask my client if he used drugs

21    or alcohol on the date of the incident.  I just ask that he

22    be precluded from saying isn't it true you said to the

23    hospital that you used drugs and alcohol or elicit

24    testimony that he had used alcohol or drugs any other time

25    other than the date of the occurrence because that's all

8

Proceedings

1      extrinsic and it's, you know evidence that --

2                  THE COURT:  It's also a couple days after the

3      incident.

4                  MR. HACKWELDER:  Right.  Like I said, I don't

5      want him to be asked:  "Isn't it true you said this in the

6      hospital" because it's irrelevant and it suggests to the

7      jury that it actually was said.

8                  MR. ZEITLIN:  Your Honor, I disagree.  I think

9      the Court ruled that it was redacting that portion --

10                 THE COURT:  Yes.

11                 MR. ZEITLIN:  -- of the hospital record.  The

12     Court never ruled I couldn't ask the questions about

13     alcohol or marijuana use, which --

14                 THE COURT:  You can --

15                 MR. ZEITLIN:  -- is germane to this case.  It's

16     my client's defense.  My client claimed that he was

17     stinking drunk and smelled alcohol -- he smelled marijuana

18     on top of the alcohol in his deposition.  That's

19     certainly --

20                 THE COURT:  That has to do with what happened on

21     the date and time of the occurrence.  You certainly can ask

22     the plaintiff questions along those lines of what happened

23     on the date and time of the occurrence and his answer will

24     be whatever it is.

25                 MR. HACKWELDER:  Right.  I agree with that, Your

A.65

D_000435

Proceedings

1    Honor.  My --

2              MR. ZEITLIN:  What the Court is ruling is that I

3    can't ask the plaintiff if he told the hospital that he

4    used marijuana --

5              THE COURT:  The words hospital and marijuana or

6    hospital or alcohol are not to be in the same sentence.

7              MR. ZEITLIN:  All right.

8              Now, the next point, Your Honor, is the plaintiff

9    claims that my client's father rented a space in this

10   building and that the building brought a civil action in

11   Landlord-Tenant Court to evict my client's father.  The

12   case was settled.  I believe the settlement was that my

13   client's father owed 19,000 and some odd dollars to the

14   building and that if he left the space by a certain date,

15   they were going to excuse that arrears or those arrears.

16   He did leave and the arrears were excused.  I don't think

17   that that should be allowed as testimony in this case,

18   anything about the landlord-tenant case, which had nothing

19   to do with my client, and it was years prior to this

20   incident.

21              THE COURT:  Mr. Hackwelder?

22              MR. HACKWELDER:  Yes, Your Honor.  I think it's

23   highly relevant to the situation that occurred on the night

24   of this incident.  Both plaintiff and defendant in their

25   depositions had testified that there were accusations or

Proceedings

1      questions surrounding my client's belief that the

2      defendant's family had stolen money from the building.

3      While landlord/tenant action would not, technically be

4      stealing and being, you know, behind on rent would not be

5      stealing in a legal technical sense.  To a layperson they

6      may do that as look, you know,they're pocketing money or,

7      you know, the building is not getting money that it should

8      get and a layperson may consider something to that effect

9      as stealing.

10             So it's nearly impossible to try this case and

11     explain to the jury why this incident may have occurred if

12     there is not at least some mention of the fact that my

13     client -- that the defendant either says that my client

14     went up to him and said, you know, your parents -- your

15     family is stealing money or, as my client says, the

16     defendant asked him, do you think my family is stealing

17     money?  And he says, yes, because that's what precipitated

18     the actual physical altercation.

19             MR. ZEITLIN:  Your Honor, if I could respond to

20     that briefly.

21             THE COURT:  Sure.

22             MR. ZEITLIN:  From my knowledge of this case,

23     there was also an allegation that 15 years prior to this my

24     client's mother, who was head of the board of the building,

25     did something improper, which was not true, of course, but

Proceedings

1    I don't think anybody ever alluded to any landlord-tenant

2    case and I think we're obfuscating this case by allowing

3    testimony about a landlord-tenant case that has nothing to

4    do with my client.

5         THE COURT:  All right.  It is the Court's

6    determination that any issue with respect to the

7    defendant's mother is irrelevant, however, the history in

8    the Landlord-Tenant Court with respect to the defendant's

9    father was admissible and I was under the impression,

10   correct me if I'm wrong, that there was going to be a

11   stipulation as to those facts to avoid any misstatement.

12        MR. HACKWELDER:  Yes, Judge, I believe that, if I

13   recall, what the resolution we came to was that my client

14   would be allowed to testify that the defendant asked him

15   the question:  Do you believe my family is stealing money

16   from the building?  He could say, yes, but then not answer

17   any questions as to why he held that belief and that you

18   would give a statement saying I'm taking judicial notice of

19   the fact that there was a stipulation in Landlord-Tenant

20   Court where defendant's father owed back rent.

21        THE COURT:  All right.  If you want the Court to

22   put that stipulation on the record, kindly write it out so

23   I don't misstate anything.

24        MR. ZEITLIN:  Your Honor, I object to this

25   stipulation.  That's not between these parties and if he

12

Proceedings

1          wants to testify about something --

2                    THE COURT:  All right.

3                    MR. ZEITLIN:  -- to allow any kind of document or

4          stipulation into evidence would be completely prejudicial

5          and would be reversible error.

6                    THE COURT:  All right.  Let's do it this way.

7          Also, in limine at some point, Mr. Hackwelder, I will

8          advise the jury that the Court takes judicial notice of an

9          event that occurred in Landlord-Tenant Court and you will

10         put on the record in front of the jury what it is that the

11         record reflects.  Just let me know what it is beforehand.

12                   MR. HACKWELDER:  I have a copy of the

13         landlord-tenant stipulation.  I'll show it to Your Honor

14         and counsel.

15                   THE COURT:  Okay.

16                   MR. ZEITLIN:  I just want to make sure that my

17         objection is noted --

18                   THE COURT:  Sorry?

19                   MR. ZEITLIN:  -- and all the rulings.

20                   THE COURT:  I'm sorry?

21                   MR. ZEITLIN:  I just want to make sure.  I don't

22         know if I objected to all of the rulings that were made by

23         the plaintiff, but my objections are noted.

24                   THE COURT:  Okay.

25                   MR. ZEITLIN:  And the next point is an issue

Proceedings

1    regarding the charge to the jury.  The issue is that I

2    believe the charge is going to state that if the jury finds

3    the defendant was justified in his actions and was acting

4    in self defense, that they should find a verdict for the

5    defendant, but if they find that he was not justified, they

6    should proceed further.  If they proceed further, I believe

7    the doctrine of comparative fault -- even though this is

8    not a negligence case, the doctrine of comparative fault --

9              THE COURT:  Actually, it's the opposite; I am

10   going to charge comparative fault and permit the jury to

11   provide percentages of responsibility.

12             MR. ZEITLIN:  I want to place on the record two

13   cases; David Mafoud, M-A-F-O-U-D, Appellant, versus The

14   City of New York, et al., Respondents.  It's 200 AD2d 561,

15   Supreme Court, Appellate Division, Second Department, and I

16   want to cite Kristy J. Arbegast, A-R-B-E-G-A-S-T,

17   Appellant, versus Board of Education of South New Berlin

18   Central Schools, Defendant, and Buckeye Donkey Ball

19   Company, Respondent, and that's 65 NY2d 161, Court of

20   Appeals of New York, and I believe that those cases say the

21   statute does not merely require the calculation of the

22   comparative degrees of negligence of the parties, but

23   rather requires the calculation --

24             THE COURT:  Rather what?

25             MR. ZEITLIN:  I'm sorry -- rather requires a

14

Proceedings

1      calculation of the comparative degrees of all types of

2      culpable conduct giving rise to damages.

3                    THE COURT:  You wish to be heard?

4                    MR. HACKWELDER:  Yes, Your Honor.

5                    We had a lengthy discussion about this topic in

6      chambers.  My position is that the appropriate way to

7      handle this matter is with a mitigation of damages charge.

8      I base that belief on the case Killon, K-I-L-L-O-N, v.

9      Parrotta, P-A-R-R-O-T-T-A.  That's 28 -- Court of Appeals

10     case.  I apologize.  It's a Third Department Appellate

11     Division case, Killon v. Parrotta.  In that case the Court

12     specifically states that it's not a comparative fault

13     charge, it actually goes to mitigation of damages in an

14     assault case.

15                    The cases cited by defense counsel are both

16     negligence cases, so I don't think they're on point.

17                    THE COURT:  All right.  The difficulty the Court

18     has with following the Killon case is that it's a short

19     cite.  If this matter should be reviewed or when it's

20     reviewed in the future by any interested party or parties

21     by proving an apportionment provision on the jury sheet,

22     the reviewing entity will have some guidance as to what it

23     is the jury was thinking and why they came to their

24     conclusion, not like matters where there are multiple

25     allegations in negligence cases of degrees -- of causes of

A.71

D_000441

15

Proceedings

1    action that the jury would render separate verdicts as to

2    each cause of action.  This is just with respect to the

3    opportunity of the reviewer to see what the jury was

4    thinking and how they came to their conclusion.  This makes

5    it much clearer by providing the -- allocute damages, no

6    degrees of fault.

7              All right.  Everybody has an exception to any

8    adverse rulings.  Are we ready for the jury and the Court

9    and counsels' openings at this time?

10             MR. HACKWELDER:  I have two issues that I'd like

11   to raise; one is voir dire.  There was some objections I

12   made that I was overruled on with respect to a couple of

13   jurors regarding charge.  I'd just like to preserve that

14   for the record.

15             THE COURT:  All right.  Put the detail so you can

16   preserve the record.

17             MR. HACKWELDER:  I'm sorry?

18             THE COURT:  You want to put some details on the

19   record?

20             MR. HACKWELDER:  Yes, I just want to say what it

21   was.

22             Your Honor, we have a juror on the panel, I don't

23   recall what number he is at this time, I think his name is

24   Nathanson.  The juror -- we brought the juror in and spoke

25   to him separately with Your Honor and defense counsel.  The

Proceedings

1    Court asked him if he could follow the evidence and render

2    a fair and partial verdict.  He said "I will do my best" I

3    believe was the statement, but the thing that concerned me

4    is he made a statement to the effect of based off what I've

5    heard so far, which is just the parties' voir dire, that he

6    was leaning towards the defendant.  That going into this

7    trial, without having heard all of the evidence, he would

8    be leaning towards the defendant.

9         Your Honor, I believe, summarizing what occurred

10    correctly, asked him, well, once you hear all of the

11    evidence, do you think maybe you can be fair and impartial?

12    And he said, well, yes, maybe, I guess so, but if I'm

13    laying my cards -- the exact statement was:  "If I'm laying

14    all of my cards on the table, as I sit here right now, I'm

15    leaning towards the defendant."  So it's my position that

16    that juror should have been struck for cause, that he is

17    clearly not a fair and impartial juror, that he did not

18    make an unequivocal indication that he'd be fair and

19    unbiased as required by People v. Johnson, which is the

20    seminal case on these issues.  It's a Court of Appeals

21    case.

22         The other thing that had occurred in that

23    instance was there was another juror that I had asked to be

24    dismissed for charge, a juror by the name Vucjek(ph) and

25    his statements were to the effect of again, that he could

Proceedings

1    not be fair and impartial and ultimately, I had to exercise

2    a challenge.  I think his -- Mr. Vucjek's(ph) statement was

3    that the plaintiff would have a high hurdle and that it

4    would have to be egregious for him to find for the

5    plaintiff.  As a result, I used a preemptive challenge.

6    After I used my preemptive challenge the defendant did not

7    exercise a preemptive challenge.  When I went to use my

8    last preemptive on Nathanson, Your Honor said, no, you

9    don't to do, the defendant didn't go, which I think is not

10   the correct way that should be implemented.  I don't think

11   you lose a chance to exercise a preemptive unless you,

12   yourself, fail to exercise one.

13        So those are my statements, Your Honor.  Thank

14   you.

15        THE COURT:  Just so the record is clear, let me

16   say with respect to the first juror, Levinson -- was that

17   his name.

18        MR. ZEITLIN:  Nathanson, Your Honor.

19        THE COURT:  The final point to assure me, that,

20   of course, I would follow the Court's instructions with

21   respect to my service as a juror here and render a fair and

22   impartial verdict.  That's my recollection with respect to

23   him.

24        With respect to the error that the Court made

25   with regard to challenges, and I realize at that point

18

Proceedings

1     plaintiff's counsel still did have a preemptory challenge

2     available, he could have used it to exclude

3     Mr. Levinson[six] had the Court permitted it to go forward.

4     The Court acknowledges its error and provides

5     Mr. Hackwelder at this time an opportunity to request a

6     mistrial or alternatively, I'm going to give a ruling on

7     this and ask for input from Mr. Zeitlin, substitute one of

8     the jurors with an alternate randomly suggested.

9            MR. HACKWELDER:  Judge, that's the suggestion

10     that I would make.

11            MR. ZEITLIN:  As far as I'm concerned, I believe

12     that Mr. Nathanson clearly said he that he could be fair

13     and impartial in this case and said he could sit and hear

14     all of the evidence and listen to the law and make a fair

15     determination as to what he believes is the proper case.

16            As far as changing the jury, at this point I

17     would not consent to any changes in the jury.

18            THE COURT:  Well, in an overabundance of caution

19     and, of course, the Court's admission of a relatively minor

20     error, I'm going to substitute Mr. Nathanson with one of

21     the alternate jurors who will be selected at this time

22     randomly by the clerk of our court.

23            MR. ZEITLIN:  I respectfully object to that, Your

24     Honor.

25            THE COURT:  Okay, of course.

19
Proceedings

1         THE CLERK:  Faith L. Sone.

2         THE COURT OFFICER:  Faith L. Sone, S-O-N-E.

3         THE COURT:  So before we bring the jury in, I'm

4    going to ask Mr. Nathanson to be brought before the Court.

5    Tell him to bring his stuff with him.

6         MR. HACKWELDER:  Judge, I have one other issue

7    that I'd like to raise in limine and I apologize I didn't

8    raise it sooner, but as you prepare for trial you relook at

9    things and rethink things.  There's some testimony from the

10   defendant in his deposition that there was a prior

11   disagreement, incident between plaintiff and the defendant

12   that occurred years before the incident that we are here

13   for today and at some point he testified that defendant --

14   that the plaintiff got in the defendant's face, was acting

15   very aggressive.  Defendant thought that he was testing him

16   or sizing him up.  I don't think that should be precluded

17   from the testimony.  As you're trying -- it's bringing in

18   prior bad acts and I think it's prejudicial and it has no

19   bearing on the incident that occurred that rises here

20   today.

21        THE COURT:  But doesn't it have a bearing on the

22   relationship of the parties prior to the incident?

23        MR. HACKWELDER:  Judge, the defendant testified

24   after that incident that they came to an agreement that

25   they would just let bygones be bygones and go back to their

Laura L. Ludovico, SCR

A.76

D_000446

Proceedings

1       relationship of saying hi and bye to one another, so I just

2       think prior testimony of him being aggressive is

3       prejudicial and it's not -- it's extrinsic evidence,

4       collateral information that, you know, you're going to end

5       up with a trial within a trial.

6                    THE COURT:  Mr. Zeitlin?

7                    MR. ZEITLIN:  I believe that certainly should be

8       allowed in as the Court is allowing in some landlord/tenant

9       case --

10                   THE COURT:  The Court concurs.  The objection to

11      that testimony is overruled.  It does reflect on the

12      relationship of the parties leading up to the date of this

13      incident.

14                   THE COURT OFFICER:  Are you ready for the jury,

15      Your Honor?

16                   THE COURT:  Yes, first I want to speak with

17      Mr. Nathanson.

18                   (Juror enters the courtroom.)

19                   THE COURT:  You're not in trouble, relax.  Just

20      after further consultation with the attorneys and you saw

21      how complex jury selection actually gets, I have decided to

22      excuse you from further service in this case.  I'm sure

23      you're terribly disappointed, but I do want to thank you

24      for your willingness to sit on the case and, you know,

25      attend to jury duty.

21

Proceedings

1           I'm sure counsel thank you as well.

2           MR. HACKWELDER:  Yes, thank you.

3           MR. ZEITLIN:  Thank you.

4           THE COURT:  Good luck to you.

5           JUROR NO. 5:  Do I get paperwork?

6           THE COURT OFFICER:  It will be mailed.

7           THE COURT:  Stay well and stay safe.

8           JUROR NO. 5:  Enjoy your weekend.

9           THE COURT:  Thank you.

10          (Juror leaves the courtroom.)

11          THE COURT:  All right, fair enough.

12          (Brief pause in the record.)

13          MR. ZEITLIN:  There was one point I forgot to

14   make before the jury enters, Your Honor, if I could.  The

15   plaintiff has pictures of the plaintiff that he wishes to

16   show the jury.

17          THE COURT:  You want to use them during your

18   opening?

19          MR. ZEITLIN:  What is that?

20          THE COURT:  You want to use them during your

21   opening, is that it?

22          MR. ZEITLIN:  No, it's the plaintiff's pictures.

23          THE COURT:  Plaintiff's pictures.

24          MR. ZEITLIN:  I would argue it's buttressing and

25   he doesn't have any medical testimony and should not be

23-01011-jpm   Doc 11-2   Filed 10/27/23   Entered 10/27/23 10:33:02   Exhibit Ex. B
Court Address to Jury In A.79-9U - Trial Transcript   Pg 22 of 124

22

Proceedings

1    accepted.

2              THE COURT:  What are the pictures of?

3              MR. ZEITLIN:  Of the plaintiff himself, his face.

4              MR. HACKWELDER:  Judge, I have two pictures that

5    I would like to show that have been exchanged that we had

6    e-mailed prior to the pretrial conference.  They show the

7    plaintiff's swollen face following the surgery even without

8    medical evidence.  There is medical evidence because we

9    have the hospital record.

10             THE COURT:  The objection is overruled.

11             MR. ZEITLIN:  Respectfully excepted.

12             THE COURT OFFICER:  Jury entering, all rise.

13             (Jurors entered the courtroom.)

14             THE COURT:  Good morning, ladies and gentlemen.

15   At the outset I want to let you know -- please be seated.

16             Good morning ladies and gentlemen, at the outset

17   I want to thank you for your patience and perseverance with

18   us.  This case, like so many others occasionally happen,

19   this morning everybody was here on time; all of the

20   parties, all of the attorneys, but, of course, a number of

21   issues came up, and I thought if we discussed them first it

22   would shorten the process and perhaps make things easier

23   for you and I think that was accomplished here, so I want

24   to thank you for that and let you know that you did not

25   waste your time sitting in a jury room, although it

D_000449

Proceedings

1    probably felt like that, all right?

2         The other thing we took care of is, for reasons

3    of -- for a number of reasons, which have nothing to do

4    with his health or anything like that, I have determined to

5    excuse Mr. Nathanson from the jury and he has been

6    replaced -- will be replaced by Alternate Juror Faith Sone,

7    okay?  So you see how important alternate jurors are.  Even

8    a short sort case like this it became very important.

9         All right.  So in any event, at this time,

10   members of the jury, we are about to start the trial of

11   this case about which you have heard some detail during the

12   process of jury selection.  Before the trial begins,

13   however, there are certain instructions that you should

14   have in order to understand what you will hear and see and

15   how you should conduct yourselves during the course of the

16   trial.

17        When I have completed these opening instructions

18   to you, the attorneys will make opening statements to you

19   in which each will outline for you what he expects to

20   prove.  The purpose of such opening statements is to tell

21   you about each party's claim so that you will have a better

22   understanding of the evidence as it is introduced.  What is

23   said in such opening statements is not evidence.  The

24   evidence upon which you will base your decision will come

25   form the testimony of witnesses here in this courtroom or

Proceedings

1    from examinations before trial or in the form of

2    photographs, documents or other exhibits introduced into

3    evidence.

4            And before I proceed further, I want to impress

5    upon you the importance of letting us know if, at any time,

6    you don't hear or see something during the course of this

7    trial.  I realize the conditions are not ideal with all of

8    this plexiglass and a little bit of feedback from the

9    microphones, but do not hesitate to let us know if you're

10   not hearing or understanding or seeing anything that goes

11   on in this courtroom.

12           Right now the plaintiff makes his opening

13   statement first and is followed by the defendant.  After

14   the opening statement, the plaintiff will introduce

15   evidence in support of his claim.  Now, normally a

16   plaintiff will produce all of his witnesses and complete

17   his entire case before the defendant introduces any

18   evidence.  Exceptions are sometimes made to that rule in

19   order to accommodate witnesses and so on.  I don't think we

20   will have that concern in this case, but it could happen.

21           After the plaintiff has completed the

22   introduction of all of his evidence, the defendant may

23   present witnesses and exhibits.  Each witness is first

24   examined by the party who calls that witness to testify and

25   then the opposing party is permitted to question the

Proceedings

1    witness.  That's called cross-examination.  We've all seen

2    it 100 times on TV and in the movies.  It's the same thing

3    here, except it generally goes a little slower in real

4    court than on TV.

5            At times during the trial an attorney may object

6    to a question or to the introduction of an exhibit or make

7    motions concerning legal questions that apply to the case.

8    Any arguments in connection with such motions will be made

9    outside of the presence of the jury.  Any ruling upon such

10   objection or motion will be based solely upon the law.

11   Therefore, you must not conclude from any ruling or

12   anything I say during the course of the trial that I favor

13   any party to this lawsuit and I assure you that I do not.

14   After such a ruling you may hear one of the attorneys take

15   what we call an exception to the Court's ruling.

16   Exceptions have nothing at all to do with your role in the

17   case and I mention the procedure to you in order that you

18   may not be confused or mystified should you hear the word

19   during the course of the trial.  If an attorney takes an

20   exception to one of my rulings, rest assured I am not

21   offended, it's part of the process in making a complete

22   record here.

23            Now, upon the completion of evidence, the

24   attorneys will again speak to you in what's known as a

25   closing statement or summation.  In summing up the

Proceedings

1    attorneys will point out what they believe the evidence has

2    shown, what inference or conclusion they believe you should

3    draw from that evidence and what you should reach as your

4    verdict.

5            What is said by the attorneys in summations, just

6    like what is said by them in their opening statements or in

7    the making of objections or motions during the course of

8    the trial is not evidence.  Summations are intended to

9    present the arguments of the parties based upon the

10   evidence.  Under our system the defendant will sum up

11   first, followed by the plaintiff.

12           After summations I will instruct you on the rules

13   of law that apply in the case and you will then retire for

14   your deliberations.  Your function as jurors is to decide

15   what has or has not been proven and apply the rules of law

16   that I will give to you to the facts as you find the facts

17   to be.  The decision you reach will be your verdict.  Your

18   decision will be based upon the testimony that you hear and

19   the evidence and exhibits that will be received in evidence

20   during the course of the trial.

21           You are the sole and exclusive judges of the

22   facts.  Nothing I say or do should be taken by you as any

23   indication of my opinion as to the facts.  As to the facts,

24   neither I nor anyone else may invade your province.  I will

25   preside impartially and not express any opinion concerning

Proceedings

1      the facts.  Any opinion of mine on the facts would, in any

2      event, be totally irrelevant, again, because the facts are

3      for you and you alone to decide.

4             On the other hand and with equal emphasis, I must

5      instruct you that in accordance with the oath that you took

6      as jurors, you are required to accept the rules of law that

7      I give to you whether you agree with the rules of law or

8      not.  You are not to ask anyone else about the law, not

9      even if there is a judge or lawyer sitting as a member of

10     your jury.  You should not consider or accept any advice

11     about the law from anyone else, but me.

12            As the sole and exclusive judges of the facts you

13     must decide which of the witnesses you believe, what

14     portion of their testimony you accept and what weight you

15     give to that testimony.  At times during the trial I may

16     sustain objections to questions and you may hear no answer

17     or where an answer has been made I may instruct that it be

18     stricken and removed from the record and that you disregard

19     it and dismiss it from your minds.  You may not draw any

20     inference or conclusion from an unanswered question, nor

21     may you consider any testimony which has been stricken or

22     removed from the record in reaching your decision.  Should

23     that happen during the course of this trial, I will remind

24     you of that rule.  The law requires that your decision be

25     made solely upon the evidence before you.  Any items that I

Proceedings

1    exclude from your consideration will be excluded because

2    they are not legally admissible.

3              The law does not require that you accept all of

4    the evidence that I admit.  In deciding what evidence you

5    will accept, you must make your own evaluation of the

6    testimony given by each of the witnesses and decide how

7    much weight you choose to give to that testimony.  The

8    testimony of a witness may not conform to the facts as they

9    occurred because he or she is intentionally lying, because

10   the witness did not accurately see or hear what he or she

11   has testifying about because the witness's recollection is

12   faulty or because the witness has not expressed himself or

13   herself clearly in testifying.  As we understand it, this

14   case will only be himself that we are dealing with.

15             There is no magical formula by which you evaluate

16   testimony.  You bring with you to this courtroom all of the

17   experience and background of your everyday lives.  In your

18   everyday affairs you decide for yourselves the reliability

19   or unreliability of things that people tell you.  The tests

20   that you use in your everyday dealings are the very same

21   tests which you will apply in your deliberations.  The

22   interest or lack of interest of any witness in the outcome

23   of the case, the bias or prejudice of a witness, if there

24   be any, the appearance, the manner in which the witness

25   gives testimony on the stand, the opportunity that the

D_000455

Proceedings

1    witness had to observe the facts about which he or she is

2    testifying, the probability or improbability of the

3    witness's testimony when considered in light of all of the

4    other evidence in the case are all items to be considered

5    by you in deciding how much weight, if any, you will give

6    to a witness's testimony.

7          If it appears that there is a discrepancy in the

8    evidence, you will have to consider whether the apparent

9    discrepancy can be reconciled by fitting the stories

10   together.  If, however, that is not possible, you will then

11   have to decide which of the conflicting stories you will

12   accept.  The purpose of the rules I have just outlined for

13   you is to make sure that a just result is reached when you

14   decide this case.

15         For the same purposes you should keep in mind

16   certain rules governing your own conduct as jurors during

17   any recess.  Since the case involves something that

18   happened at a particular location that you will hear about

19   during the trial, you may be tempted to visit that location

20   yourself.  Please do not do so.  Even if you happen to live

21   near the location, kindly avoid going to it or even past it

22   until the case is over.  In addition, please do not attempt

23   to view the scene by using any computer programs such as

24   Google Earth.  Viewing the scene either in person or

25   electronically would be unfair to the parties since the

Proceedings

1    location as it looked at the time of the incident and as it

2    looks now may be very different.  Additionally, making a

3    visit to any location without the benefit of an

4    explanation, you might get a distinct impression on matters

5    not properly before you, leading to unfairness to the

6    parties who need you to decide this case based upon the

7    evidence that is relevant to this matter based on the

8    evidence which is relevant to this matter and that you will

9    hear only in this courtroom.

10          In fairness to the parties to the lawsuit, it is

11   very important that you keep an open mind throughout the

12   course of this trial.  Then after you have heard both sides

13   fully, you will reach your verdict only on the evidence as

14   presented to you within the four walls of this courtroom

15   and then only after you have heard the summation of each of

16   the party's attorneys and my instructions to you on the

17   law, you will then have an opportunity to exchange views

18   with each member of the jury during their deliberations and

19   to arrive at your verdict.

20          Please do not discuss this case either among

21   yourselves or with anyone else during the course of the

22   trial.  Do not do any independent research on any topic or

23   subject you might hear about in the testimony or see in the

24   exhibits, whether by consulting others, referring to books

25   or magazines or conducting any kind of an internet search

Proceedings

1    of any kind.  So please remember, as tempting as it might

2    be, not to do that.

3              Any and all electronic devices, including cell

4    phones, Blackberries, iPhones, laptops, Kindles or any

5    other personal electronic devices must be turned off while

6    you are in the courtroom and when you are deliberating.  It

7    is important to remember that you may not use any such

8    internet service to individually or collectively research

9    any topic concerning the trial, which includes the law,

10   information about any of the issues in contention, the

11   parties, the lawyers or even of the Court.

12             After you have rendered your verdict and have

13   been discharged, you are free to do any research you choose

14   or to share your experiences.  Of course, that, again, is

15   after you have reached your verdict, and you may do this

16   either indirectly or directly or through your favor

17   electronic means.  Right now please be careful to remember

18   these rules whenever you use a computer or other personal

19   device during the time you are serving as a juror, but are

20   not in the courtroom.

21             While these instructions might seem unduly and

22   partially restrictive it is vital that you carefully follow

23   the directions.  The reason is simple.  The law requires

24   and the parties and the Court are relying upon you to

25   consider only the evidence and the testimony you hear and

Proceedings

1       see in this courtroom.  To do otherwise by allowing outside

2       information to affect your judgment is unfair and

3       prejudicial to the parties.  Accordingly, I expect that you

4       will seriously and faithfully abide by this instruction.

5              Please do not permit any person who is not a

6       juror to discuss this case in your presence and if anyone

7       does so despite your telling them not to, report back to me

8       or Officer Al as soon as you are able.  You should not,

9       however, discuss with your fellow jurors that fact or any

10      other fact that you feel necessary to bring to the Court's

11      attention.

12             Although it is the normal human tendency to talk

13      to people to which you come in contact, please do not

14      during the time you serve on this jury talk, whether inside

15      or outside of this courtroom, with any of the parties or

16      their attorneys or any witnesses.  By this I mean not only

17      do not talk about the case, do not talk to them at all, not

18      even to pass the time of day, all right?  So if you see any

19      of the parties or the witnesses or anybody associated with

20      this case at all, just ignore them, all right?  They're

21      going to ignore you.  I'm directing them to ignore you.

22      Nobody is going to be offended.  It's the only way for that

23      we can assure the absolute impartiality that the parties

24      are entitled to and expect from you as jurors.

25             Now, under the law only six jurors will

Proceedings

1    deliberate in this case when it is submitted for

2    consideration.  We have selected additional jurors as

3    alternate jurors.  They are selected to serve because a

4    regular juror may be prevented from continuing to serve by

5    some emergency, as we noticed happened here already this

6    morning.  Although this seldom happens during the trial,

7    there are cases where we do call on the services of

8    alternates.  The alternate is, of course, required to pay

9    the same careful attention to the trial as regular jurors

10   so that if needed they will be fully familiar with the

11   case.  The fact that there is an alternate juror does not

12   mean that any regular juror is free to excuse themselves

13   from the case.  As a duly chosen juror it is your

14   obligation to be available throughout the trial.

15           This description of procedure and rules governing

16   your conduct and the legal principles I have discussed with

17   you, I believe, will make it easier for you to understand

18   the trial as it goes on and to reach a just result at its

19   conclusion.

20           Before we hear the opening statements, I just

21   want to make a few comments regarding this particular trial

22   and this particular courthouse.  Generally, we make breaks

23   every hour, hour and 15 minutes depending on when it's a

24   good time to interrupt the witness's testimony if that's

25   necessary.  Now, if anybody has an emergency during the

Proceedings

1       course of the trial or needs to break earlier or at a

2       different time, just raise your hand and get the officer's

3       attention and we'll certainly address that.  You may have

4       heard that in some courts around the country there is

5       note-taking.  We do not permit the taking of notes during

6       the course of the trial.  The reason for that is very

7       simple.  As I just explained to you, it's very important

8       that you analyze the testimony from the witnesses that is

9       coming to you from the stand.  We have set up a large

10      screen that should give you a closeup of the witness who

11      will be testifying to my left here with a clear mask to

12      give you a better opportunity to make your assessment and

13      analyses.  So that's why we don't permit taking notes.

14              Additionally, taking notes is a procedure that

15      gets involved which takes a half hour every morning to

16      disburse the notes and a half hour in the afternoon to

17      collect the notes.  We don't want to get involved in that.

18      Better you should spend your time and attention analyzing

19      the testimony and the exhibits as it's being presented to

20      you.

21              If you wish to bring water or a beverage into the

22      courtroom, you are, of course, welcome to do so.  There is,

23      however, not eating or gum chewing during the course of the

24      trial.

25              Counsel, please advise your witnesses or anybody

23-01011-jpm    Doc 11-2    Filed 10/27/23    Entered 10/27/23 10:33:02    Exhibit Ex. B
Opening Statement. Mr. Hackwelder for Plaintiff    Pg 35 of 124

35

Proceedings

1      associated with either side, that anybody observed chewing

2      gum or eating in the courtroom will be summarily removed

3      from the courtroom, never to return.

4              If you do bring a beverage to the courtroom,

5      members of the jury, please make sure it has a screw-on cap

6      so that we can avoid any spills.

7              Again, as I said, we try to start in the morning

8      by 10:00 and we always break by 4:30.

9              I presume counsel has no witnesses, other than

10     the parties, correct?

11             MR. HACKWELDER:  Correct.

12             MR. ZEITLIN:  Correct, Your Honor.

13             THE COURT:  All right, to avoid any unnecessary

14     crosscurrent, I'm directing that the restroom facilities on

15     this floor be reserved for the jurors from this point

16     forward and any other necessity by anybody associated by

17     any party associated with either side, use the facilities

18     on the other floors and there are same on each floor, other

19     than one, I think.

20             All right.  So with that, that concludes the

21     Court's instructions to you.  At this time we'll hear the

22     opening statement.  If Counsel Hackwelder is ready, the

23     floor is all yours.

24             MR. HACKWELDER:  Thank you, Your Honor.

25             The evidence will show that for months the

Proceedings

1    Plaintiff Raul Matos could not eat solid food; he lost

2    weight.  In fact, it took him months of rehab to be able to

3    regain the ability to bite, to chew food to speak clearly.

4    You see, Raul's jaw had been wired shut because he had to

5    have a surgery.  He had a plate and screws placed into his

6    jaw to fix a fracture of the left side of his jaw.

7    Fortunately, the fracture on the right side of his jaw did

8    not have to have plates and screws in it to fix the

9    fracture.

10           You see, Raul's life was dramatically changed on

11   the early morning of December 25, 2015.  Raul had been

12   trying to diffuse an argument when he was sucker punched by

13   the defendant.  In those short moments Raul suffered

14   injuries, injuries that continue to affect him to this day.

15           Ladies and gentlemen of the jury, let me mind my

16   manners and let me, first of all, thank you for being here

17   today.  I don't for one second take for granted the service

18   that you're providing, the sacrifice that you're making

19   being away from your family, from your jobs, from whatever

20   it is that you do on a day-to-day basis.  So I think I

21   speak for everyone here that, you know, especially in light

22   of the situation that's going on, that we -- that, you

23   know, we're all very appreciative of what you're doing.

24           I actually would like to introduce to you my

25   client Raul Matos.  You saw him yesterday during jury

Proceedings

1       selection, but I didn't properly introduce him and I

2       apologize for that and you will be hearing from him

3       shortly.

4              Now, ladies and gentlemen, as you know by now, I

5       represent Mr. Matos, so let me tell you a little bit about

6       him.  He's lived in the same apartment for nearly all of

7       his life.  The building where he lives is now being

8       renovated.  There's a program where the apartments in that

9       building are going to be turned into a cooperative.  The

10      tenants will be shareholders in that building.  There's a

11      partial space, and you'll hear about that, in the building

12      as well.

13             Now, Mr. Matos, has been working in accounts

14      receivable for about the last ten years or so.  He works

15      for a nonprofit, the Pension Boards – United Church of

16      Christ, and in his free time he enjoys playing basketball,

17      he likes to draw and design architecture, specifically,

18      like the outsides of the buildings or the designs of

19      buildings.

20             Now, ladies and gentlemen, the evidence will show

21      that Raul knew the defendant, the man who sucker punched

22      him, and that he had known him nearly all his life.  You

23      see, they both live in the same building, okay?  Now, Raul,

24      he's a little bit older than the defendant, so it wasn't

25      that they really associated with one another.  They weren't

Proceedings

1    buddies or anything like that.  Their relationship was more

2    of a hello/good-bye kind of association.  And you'll hear

3    about the events that led up to the incident, to Mr. Matos

4    being sucker punched.

5         Raul, on December 24th went to work, what he

6    does.  It was a weekday, Friday.  He came home, he

7    showered, he met a friend of his Luis Ferrer.  They went to

8    a bar.  They spent some time at the bar.  Raul didn't drink

9    that day.  After leaving the bar, Raul went back to his

10   apartment, back to his building.  And I mentioned that

11   commercial space.  There was an event going on.  Some of

12   the other tenants were having an event, a party if you want

13   to call it that, and Raul was there for sometime.

14        Now, approximately 1:00 he got wind that there

15   had been two people arguing outside of the building.  When

16   he goes outside to see what's going on, he sees Mr. -- he

17   sees the defendant and another tenant in an argument.  He

18   goes to diffuse the situation.  When he goes to diffuse the

19   situation, the defendant asked him a question that he

20   didn't like the answer to and you'll hear what that was

21   when Mr. Matos testifies.  When he hears the answer he

22   doesn't like the answer to, there's a silence.  Mr. Matos

23   goes to leave, he turns around to go down the stairs, he's

24   sucker punched, and that's how this all happened.

25        Now, of course, you're going to hear a different

Proceedings

1    version or we wouldn't be here, right?  We wouldn't be here

2    six years after the fact trying to make a decision on this

3    case if there wasn't a different version.  Interestingly,

4    you know, a lot of the details are the same.  For instance,

5    you'll hear the defendant did punch Raul.  You'll hear that

6    where the punch occurred, they both agree that it's the

7    same location, the steps out front of the front door of

8    their building.  You will also hear that there was another

9    tenant there who witnessed all of this.

10           Now, where the stories diverge is, you know, how

11    this happened, why it happened and also, according to

12    defendant, one of his friends were there; a man by the name

13    of Freddy Gomez, but he's not here today.  And according to

14    the defendant, I believe what he'll testify to is that the

15    plaintiff, for no reason, walked up to him, got in his

16    face, started arguing, walked past -- up the stairs and

17    walked past his friend Freddy Gomez and provoked a fight

18    and all the while Freddy Gomez, defendant's friend, just

19    sits there and watches it happen.

20           Now, ladies and gentlemen, I just want to be

21    brief on this opening because you're going to hear the

22    evidence shortly.  I'm going to ask you -- your job is

23    going to be difficult.  You're going to be asked to

24    determine the truth between two conflicting stories and I

25    don't take for granted that it's going to be a very

D_000466

40

Proceedings

1     difficult job, but I submit to you that the evidence will

2     show that Raul's version of events simply makes more sense.

3     It simply makes more sense and that's the true version of

4     the events and I think you'll see that at the end of this

5     case the defendant's version just simply can't be believed.

6     So at the end of this case I'm going to have the

7     opportunity to speak to you again.  I will remind you of

8     the injuries that Raul sustained, of those months where he

9     couldn't eat, he couldn't bite, he had difficulty speaking,

10    I'll remind you of the numbness that he still feels today

11    on the left side of his face and I will ask you to render a

12    verdict in favor of my client Raul Matos and I'm going to

13    ask you to give him 100 percent justice, nothing more,

14    nothing less.

15            Thank you very much.

16            THE COURT:  Thank you, counsel.

17            Mr. Zeitlin, on behalf of the defense?

18            MR. ZEITLIN:  I guess I'll speak from here.

19            Good afternoon, ladies and gentlemen.

20            Again, I'm Steve Zeitlin, I'm the attorney for

21    the Defendant Steven Hiraldo and I sat listening to the

22    opening statement of my colleague Mr. Hackwelder and, of

23    course, we have a whole different version of this

24    particular case.  We're going to show you that my client

25    Steven Hiraldo is in his mid thirties, he's worked as a

Proceedings

1    concierge in a building in Manhattan for the past ten

2    years.  He's someone that's never had any difficulty with

3    his job.  He's never been convicted of a crime.  He lived

4    in the same building for many, many years as Raul Matos.

5    So the whole situation is what happened on the early

6    morning of Christmas day after Christmas Eve?  I think this

7    was one or 2:00 in the morning of the a.m. of Christmas

8    day.

9              The evidence is going to show that Mr. Hiraldo

10   worked as a concierge that day, Christmas Eve.  He worked

11   as a concierge until I think 10:00 at night and he came

12   home.  The evidence is going to show that Mr. Hiraldo's

13   parents lived in this building and Mr. Hiraldo lived in a

14   separate apartment with his 96-year old grandmother.  So

15   the Hiraldos had two different apartments in the building.

16   Mr. Hiraldo was, at the time, living with his grandmother.

17             Now, the evidence will show what really happened

18   that day and it's going to show clearly who's telling the

19   truth and who isn't.  I'm going to show you a picture

20   during the testimony of the building itself so you have a

21   picture of what really happened here, and the picture is

22   going to show you that -- well, before I even get to the

23   picture, the evidence is going to show you that unlike

24   Mr. Hiraldo getting out of work at 10:00 in the evening on

25   Christmas Eve, Mr. Matos got out of work that day at 4:00

42

Proceedings

1    in the morning, he's going to tell you that he went with

2    his friends to a bar for three hours and didn't drink

3    anything.

4         And then he's going to tell you that he came to

5    the building after going to this bar with his friends for

6    three hours and not drinking, he's going to tell you he

7    then went to this party for a number of hours where they

8    were serving alcohol and again, he had nothing to drink or

9    no drugs of any kind, but at a point in time you're going

10   to see from the picture in this building that Mr. Hiraldo

11   came downstairs to get some fresh air between one and

12   2:00 in the morning and there's two different doors that

13   you're going to see.  One of the doors is the door where

14   this party was happening where Mr. Matos was.  He was

15   inside this party.  The other door is up a little landing

16   and you're going to see that Mr. Hiraldo was up those

17   stairs on that landing talking to another tenant in the

18   building.

19        The difference in the testimony is very clear.

20   It's going to show very clearly that Mr. Matos came out of

21   the one door, marched up I don't know how many feet, but

22   you'll look at the picture, to where Mr. Hiraldo was,

23   somehow gets into an argument with Mr. Hiraldo, then comes

24   up the stairs, confronts Mr. Hiraldo and hits him in the

25   face and that the only time Mr. Hiraldo struck the

43

Proceedings

1    plaintiff was in seld defense after he was hit in the face,

2    confronted by Mr. Matos, who he's going to testify, reaked

3    from alcohol and marijuana and that I believe Mr. Matos

4    testified previously that he wasn't injured from this

5    punch, but at some point he fell down these stairs and hit

6    his face somewhere, either on the railing or on the cement,

7    and that's where he suffered the injury.

8         So I think if you keep your minds open, pay

9    attention throughout this entire trial, at the end of this

10   case, the only fair verdict you're going to have,

11   regardless of the injury to this plaintiff, which we're not

12   denying the fact he has the broken jaw, it was wired and

13   he's recuperated, thank goodness, but regardless of the

14   injury, which is not a factor in what really happened.

15   What happened was Mr. Matos initiated a confrontation, took

16   a first swing and another swing went back and I think

17   because he was so drunk, he fell down these stairs and hurt

18   himself, but I think the only verdict you can come in with

19   is a defendant's verdict.  Mr. Hiraldo, defendant himself,

20   whatever he did was justified and come in with a

21   defendant's verdict in this case.  I ask you to just wait

22   for all of the evidence to come in and then you'll be able

23   to make a fair and proper decision in this case.

24        Thank you very much, especially for sitting

25   during these pandemic times with the masks.

A.100

D_000470

44
Proceedings

1           THE COURT:  Thank you, counselor.

2           Before we proceed with the first witness, we've

3     been at this about an hour now, does anybody need a break?

4           (Brief pause in the record.)

5           THE COURT:  All right.  We seem to be good.

6           All right.  Mr. Hackwelder, your first witness,

7     please.

8           MR. HACKWELDER:  Sure.  Plaintiff calls Raul

9     Matos.

10          THE COURT:  Mr. Matos, come up to the witness

11    stand.

12          (Witness enters the witness stand.)

13          THE COURT OFFICER:  Remain standing, raise your

14    right hand and face Dawn.

15    RAUL MATOS, having been first duly sworn, took the witness

16    stand and testified as follows:

17          THE CLERK:  Thank you.  Please be seated and

18    please state your name and address for the record.

19          THE WITNESS:  Sorry?

20          THE CLERK:  Name and address for the record.

21          THE WITNESS:  Sure.  Raul Matos and I reside at a

22    new location, 971 Amsterdam Avenue, Apartment 5S, New York,

23    New York 10025.

24          THE COURT:  Officer Al, do we have the clear mask

25    for the witness?

45

Matos – by Plaintiff – Direct

1          THE COURT OFFICER:  Put the face shield on.  You

2     can take your blue mask off.

3          THE COURT:  Members of the jury, can you see the

4     witness on the TV?

5          THE JURY:  Yes.

6          THE COURT:  Members of the jury, to keep you in

7     the loop as to what's going on here, we have called MIS

8     here.  I have no idea what it stands for, but they are the

9     experts on this electronic setup.  They are on their way.

10    I'll try to find out from them how long this is going to

11    take and maybe we will take lunch a little early this take

12    they are on their way.

13          (Brief pause in the record.)

14          THE COURT:  All right.  Thank you very much and

15    please stand by.

16          (Brief pause in the record.)

17          THE COURT:  Mr. Matos, you have been sworn in,

18    right?

19          THE WITNESS:  Yes.

20          THE COURT:  Please be seated.

21          Counsel, whenever you are ready.

22    DIRECT EXAMINATION

23    BY MR. HACKWELDER:

24    Q    Mr. Matos, the address that you gave, you said it was

25    a relocated address, correct?

Matos - by Plaintiff - Direct

1    A    Correct.

2    Q    How long have you resided there?

3    A    42 years.

4    BY THE COURT:

5    Q    Not the relocated address.

6    A    About two years.

7    Q    Okay.  And why were you relocated?

8    A    We relocated because we have -- it's a program that we

9    have, it's called a tenant's association and that's where --

10   that's where the HPD is -- they give us an opportunity to

11   become shareholders and on that -- during those guidelines, the

12   tenant's association is also broken down into board members.

13   Q    How many board members are there?

14   A    There's three board members.

15   Q    And what are the positions?

16   A    President, treasurer and secretary.

17   Q    And have you ever served as a board member?

18   A    Yes, I have.

19   Q    In what capacity?

20   A    Treasurer.

21   Q    And now, what is your permanent address?

22   A    My permanent address is 161 West 108th Street,

23   Apartment 2N, New York, New York 10025.

24   Q    How long have you lived at that address?

25   A    Forty-two years.

Matos – by Plaintiff – Direct

1    Q    Who do you reside with?

2    A    By myself.

3    Q    Mr. Matos, I'm going to have you describe a little bit

4    about yourself.

5         What kind of work do you do?

6    A    My title is accounts receivable specialist.

7    Q    Where do you work?

8    A    I work for a church organization, which is a

9    nonprofit, and the name of it is called The Pension Boards

10   United Church of Christ.

11   Q    For how long have you worked there?

12   A    Approximately 11 years.

13   Q    Can you briefly describe to us your educational

14   background?

15   A    I graduated from a specialized high school, Art and

16   Design, and I continued my education at Baruch College and I

17   studied accounting.

18   Q    Do you have any hobbies?

19   A    Yes, I do.  I play basketball.  I also draw in my

20   spare time, I do architectural work, exterior and interior

21   design.

22   Q    Now, I want to turn your attention to the night of

23   December 24th, early morning of December 25, 2015.  Do you

24   remember that day.

25   A    Yes, I do.

48

Matos - by Plaintiff - Direct

1    Q    Why do you remember that day?

2    A    That day I was sucker punched.

3    Q    Who were you sucker punched by?

4    A    I was sucker punched by an individual called Steven
5    Hiraldo.

6    Q    Is Steven Hiraldo here today?

7    A    Yes, he is.

8    Q    And is that the defendant?

9    A    Yes.

10   Q    Did you know the defendant before he sucker punched
11   you?

12   A    Yes, I did.

13   Q    How did you know him?

14   A    He was a neighbor in my building.

15   Q    For how long did you know him?

16   A    Forty-two years, practically all my life.

17   Q    Can you describe the relationship you had with
18   Mr. Hiraldo?

19   A    There was never a relationship, it was just hi, bye
20   every time we see each other in the building.

21   Q    Now, on December 24, 2015, did you work that day?

22   A    Correct.

23   Q    Where did you go after you got off from work?

24   A    I got off about 4:00.  I went home to freshen up and
25   then I went downstairs to meet a friend.

49

Matos – by Plaintiff – Direct

1    Q    What was the name of the friend that you met?

2    A    His name was Luis Ferrer.

3    Q    What did you and Luis do next?

4    A    We decided to go to the bar on the corner.

5    Q    And did you meet anyone else there?

6    A    There were other people there, but I didn't know them.

7    That was his acquaintances.

8    Q    For how long did you stay at this bar?

9    A    I would say approximately like three hours.

10   Q    Were you drinking while you were at the bar?

11   A    No.

12   Q    Was Luis and his friends drinking?

13   A    Yes.

14   Q    What did you do after you left the bar?

15   A    We went to an activity/party where it's a commercial

16   space, which is the storefront of my building.

17   Q    Okay.  This commercial space that you described as a

18   storefront, can you just give us a little description of that?

19   A    Sure.  It's located in the corner and the entrance to

20   the location, it's on the side of the building.  And also, it's

21   almost as big as this room, you could say.

22            THE COURT:  As big as what?

23            THE WITNESS:  Almost as big as this room.

24   BY MR. HACKWELDER:

25   Q    And December 24, 2015, was that storefront being

Matos – by Plaintiff – Direct

1    leased?

2        A    I'm sorry?

3        Q    Was that storefront being leased?

4        A    When, December?

5        Q    On the night of the incident.

6        A    It was being leased?  No.

7        Q    Okay.  Had it ever been leased prior to this incident?

8        A    It's been leased prior, yes.

9        Q    When do you recall it last being leased?

10       A    I would say close to 2012.

11       Q    And do you know what it was a lease for?

12       A    Yes, there was a karate studio.

13       Q    Who had the karate studio?

14       A    The karate studio was run by Steven Hiraldo's father.

15       Q    Now, how long did you stay at this event?

16       A    I stood probably about three hours or so.

17       Q    And why did you leave?

18       A    I left because I heard there was an incident that was

19   going on in front of the building.

20       Q    Before we get into that, I just wanted to ask you, did

21   you know who was throwing the party?

22       A    Yes.  So it was the president's nephew's son which was

23   throwing the party, but he had permission from the president to

24   throw the party and at the same time I stood around to like

25   basically chaperone.

51

Matos - by Plaintiff - Direct

1    Q    And were you drinking while you were chaperoning this

2    party?

3    A    No, no, I had a responsibility.

4    Q    Now, you said you left because you heard a commotion,

5    correct?

6    A    Right.

7    Q    Where was this commotion?

8    A    The commotion occurred on the landing of the building,

9    the entrance.  So in order to get there, you have to walk up

10   five flights and then to enter the building there's a stoop.

11   Q    Okay.  And when you went outside where this motion was

12   occurring, what did you observe?

13   A    I observed two individuals arguing.

14   Q    Who were those individuals?

15   A    Mr. Steven Hiraldo and Ms. Elaine Candelario,

16   C-A-N-D-E-L-A-R-I-O.

17   Q    What happened next?

18   A    As I approached them, I asked them what's the

19   commotion, what's going on, and once I asked that question, I

20   had -- he asked me -- well, Mr. Steven Hiraldo right away asked

21   me a question.

22   Q    What did he ask you?

23   A    He asked me if his family was taking funds from the

24   building.

25   Q    What did you say?

Matos - by Plaintiff - Direct

1    A    I answered yes.

2    Q    What happened after --

3              THE COURT:  You're going too fast for me.  He

4    asked -- what was your question, "what did he ask you?"

5              MR. HACKWELDER:  Correct.

6              THE COURT:  What did he ask you?  Nice and slow

7    and loud.

8              THE WITNESS:  He asked me whether his family was

9    taking funds from the building.

10             THE COURT:  He asked you whether his family was

11   taking funds from the building?

12             THE JURY:  Taking what?

13             THE COURT:  Funds, F-U-N-D-S.

14             And what's the next question, what did you

15   respond, is that your next question?

16   BY MR. HACKWELDER:

17   Q    My next question is what did you say?

18   A    I said yes.

19   Q    What happened after you said yes, the defendant's

20   family was taking funds from the building?

21   A    After I said yes there was silence, so after the

22   silence, I wanted to head back to the party to the activity, so

23   as I turned towards my left and about to take my first step

24   down the stairs, I was sucker punched in the back of my right

25   side of my head.

Matos – by Plaintiff – Direct

1    Q    Who sucker punched you?

2    A    Mr. Steven Hiraldo.

3    Q    How would you describe that sucker punch?

4    A    It was a hard sucker punch, which after that my left

5    side of my cheek hit the guardrail.  Once it hit the guardrail,

6    I was falling, but at the same time Ms. Elaine was trying to

7    hold me and at the same time trying to diffuse him from

8    punching me because he was still punching me while I was

9    falling.

10   Q    At some point did you fall down the steps?

11   A    Yes, I did.

12   Q    What happened after you fell down the steps?

13   A    I don't remember.

14   Q    Were you knocked unconscious?

15   A    Yes, yes, I was.

16   Q    Okay.

17        MR. HACKWELDER:  Your Honor, I would like to

18   start utilizing the system for some photographs.  I just

19   want to show one photograph.

20        THE COURT:  All right, go ahead.

21        MR. HACKWELDER:  Your Honor, we have premarked

22   for identification purposes Plaintiff's Exhibit 2, which is

23   a thumb drive containing a few photographs.

24        (Brief pause in the record.)

25        MR. HACKWELDER:  Your Honor, I'd like to have

Matos - by Plaintiff - Direct

1    marked for identifying purpose Plaintiff's Exhibit 2A.

2                THE COURT:  You only have this on thumb drive,

3    you don't have hard copies?

4                MR. HACKWELDER:  Not of this particular

5    photograph, Your Honor, I apologize.

6                THE COURT:  All right, we'll discuss it later,

7    but for now this is 2A?

8                MR. HACKWELDER:  Correct, Your Honor.

9                THE COURT:  This appears to be a front of a

10   building with a gate in front of it.  All right.

11   BY MR. HACKWELDER:

12   Q    Raul, do you recognize what's depicted in this

13   photograph?

14   A    Yes, I do.  That's the way our building looked on the

15   day of the incident.

16                THE COURT:  The what?  You have to speak up

17   loudly and clearly.

18                THE WITNESS:  That's the way the building looked

19   on the day of the incident.

20   BY MR. HACKWELDER:

21   Q    Okay.  And is that the staircase and landing that you

22   testified about?

23   A    Yes.

24   Q    And is the guardrail depicted?

25   A    Correct.

Matos – by Plaintiff – Direct

1    Q    And is the front door depicted?

2    A    Correct.

3    Q    And that is where you saw the defendant and

4  Ms. Candelario arguing?

5    A    Yes, it was on the landing next to the door.

6              MR. ZEITLIN:  I object to leading, Your Honor.

7              THE COURT:  No, it's overruled.  It was fine.  It

8        was already testified to.

9  BY MR. HACKWELDER:

10   Q    And is that a fair and accurate depiction of the door,

11  the stairs and the landing as it existed on the date of the

12  accident?

13   A    Correct.

14             MR. HACKWELDER:  Your Honor, I move to have this

15       exhibit moved into evidence.

16             THE COURT:  Any objection, Mr. Zeitlin?

17             MR. ZEITLIN:  No objection, Your Honor.

18             THE COURT:  All right.  So it's marked and

19       deemed -- it's deemed marked 2A in evidence.

20             (WHEREUPON, Plaintiff's Exhibit 2A was deemed

21          marked in evidence.)

22             MR. HACKWELDER:  Okay.  I'm going to finish with

23       this exhibit.

24             I assume the jury can see this, correct?

25             THE JURY:  Yes.

A.112

D_000482

Matos - by Plaintiff - Direct

1   BY MR. HACKWELDER:

2       Q    Mr. Matos, what happened after you regained

3   consciousness?

4       A    After I regained consciousness I was about 25 feet

5   away from the building when I noticed I regained consciousness.

6       Q    Mr. Matos, I'm going to ask you to either pull the mic

7   down a little bit.  I think when you have the shield directly

8   in front of the mic, it sounds a little muffled.  If you pull

9   it down under the shield so it's below the shield, I think the

10  mic picks it up better.

11          Can you just repeat what you said?

12          THE COURT:  He said he regained consciousness

13      about 25 feet from the building is what he said.

14  BY MR. HACKWELDER:

15      Q    Once you regained consciousness, what did you observe?

16      A    I observed there was a few people trying to stand me

17  up and at the same time I saw Steven's parents and Steven on

18  the landing of the building.

19      Q    Okay.  What happened next?

20      A    As I regained consciousness I was trying to stand up.

21  All I seen is that they scattered upstairs once I was trying to

22  stand up.

23      Q    Once you were able to stand up and after they had

24  scattered, what did you do?

25      A    I had called the cops.

Laura L. Ludovico, SCR

A.113

D_000483

Matos – by Plaintiff – Direct

1      Q      And did the police come?

2      A      Yes, they did.  They came and it took them about, I

3  would say, about 20 to 25 minutes to arrive.

4      Q      And did you explain to the police what happened?

5      A      Yes, I told them my side of the story and I was

6  talking to them for about 15 to 20 minutes and then they

7  pursued to go up stairs to talk to Steven.

8      Q      For how long were the police on the scene?

9      A      Approximately total like about 45 minutes.

10     Q      And what happened after the police left?

11     A      After the police left I just went home.  I stood up

12  for like an extra hour or so and then I went to bed.

13     Q      What time did you get up?

14     A      I got up the next day or should I say the same day

15  towards the afternoon about -- I would say about three to 4:00.

16     Q      What did you do that day?

17     A      I didn't really do much.  I stood home.  I was

18  swelling up a little bit and I decided to try to sleep it off.

19  I wasn't sure what was going on.  I was trying to each lunch

20  that day and I couldn't really bite my food.

21     Q      Okay.  What happened the following day, and this would

22  be now December 26th, correct?

23     A      Correct.

24     Q      What happened?

25     A      The following day I wake up, I was in a lot of pain, I

58

Matos - by Plaintiff - Direct

1    couldn't even bite, so I was worried, so I decided to admit

2    myself in the hospital.

3        Q    What happened -- what did they do for you when you

4    were checked into the hospital?

5        A    They took x-rays and after my x-rays came in they

6    didn't let me leave the hospital.

7        Q    And why wouldn't they let you leave the hospital?

8        A    Basically because of the x-rays.  They showed that I

9    had two -- I had on my right-hand side two broken -- two broken

10   bones on my right side and then on my left side I had another

11   broken bone, so basically three fractures.

12               THE COURT:  Where were these fractures?

13               THE WITNESS:  There was two fractures on my

14       left-hand side and then one on my right.

15   BY MR. HACKWELDER:

16       Q    What part of your body?

17       A    On my jaw, on my left side cheek.

18       Q    Now, what did they do for you -- withdrawn.

19               How did the hospital treat these injuries, if at all?

20       A    They said that the treatment was --

21               THE COURT:  Not what they said, just what did

22       they do?

23               THE WITNESS:  I'm sorry?

24   BY MR. HACKWELDER:

25       Q    What did they do for your injuries?

Laura L. Ludovico, SCR

A.115

D_000485

Matos - by Plaintiff - Direct

1       A    They put a metal plate with screws, that way they

2   could hold both bones on the left-hand side together.

3                   THE COURT:  You had surgery?

4                   THE WITNESS:  Yes.

5                   THE COURT:  That day or another day?  Was it that

6       day, the 26th that you had the surgery?

7                   THE WITNESS:  Was the surgery on the 26th?

8                   MR. HACKWELDER:  He's asking you, when did you

9       have that surgery?

10                  THE WITNESS:  Oh, it was I believe on the 27th.

11                  THE COURT:  All right.

12  BY MR. HACKWELDER:

13      Q    And how long were you in the hospital for?

14      A    I was in the hospital for approximately, I would say,

15  four days.

16                  MR. HACKWELDER:  Your Honor, I'm going to grab a

17      document from Exhibit 1, the hospital record.

18                  (Brief pause in the record.)

19  BY MR. HACKWELDER:

20      Q    Raul, I have in front of me a document from

21  Plaintiff's Exhibit 1, which is already into evidence, which is

22  the hospital chart from Mount Sinai St. Luke's and I have in

23  front of me what's called an operative report.  It indicates

24  here that the date of operation was December 29, 2015?

25                  MR. ZEITLIN:  Your Honor, I object to the

Matos - by Plaintiff - Direct

1    leading.  This document --

2              THE COURT:  Well, first, you don't object to the

3        admission of the hospital record, correct?

4              MR. ZEITLIN:  Well, any objections were decided

5        before.

6              THE COURT:  I just asked you a simple question.

7        Are you objecting to the admission of the hospital record,

8        yes or no?

9              MR. ZEITLIN:  No.

10             THE COURT:  All right.  So it's in evidence.  It

11       can be read.  Once it's in evidence it can be read.

12             Are you going to pose a question or something

13       with respect to this?

14             MR. HACKWELDER:  Yes, I was in the middle of

15       that, Your Honor.

16             THE COURT:  Well, go right ahead.

17   BY MR. HACKWELDER:

18     Q    The date of operation indicates December 29, 2015.

19   Would that refresh your recollection as to when the operation

20   occurred?

21     A    Yes.

22             MR. ZEITLIN:  Again, I object.  The record speaks

23       for itself.

24             THE COURT:  Okay, your objection is noted.

25             Next.

Laura L. Ludovico, SCR

A.117

D_000487

1   BY MR. HACKWELDER:

2     Q    Now, the operation performed indicates that it was an

3   open reduction internal fixation of the left -- left mandibular

4   angle fracture via intra --

5               MR. ZEITLIN:  Objection.

6               THE COURT:  Any objection to reading the hospital

7       record is overruled.  We have on the record your objection

8       to all.

9               MR. ZEITLIN:  He's questioning the defendant.

10      He's not a medical expert.  He doesn't have a medical

11      doctor here, so I think --

12              THE COURT:  If he's asked an expert opinion I

13      will sustain your objection to that.  He has not been asked

14      an expert opinion so far.

15              Go ahead, Mr. Hackwelder.

16              MR. HACKWELDER:  I will repeat it because I think

17      the court reporter missed it.

18   BY MR. HACKWELDER:

19     Q    It indicates the operation performed was an open

20   reduction internal fixation of the left mandibular angle

21   fracture via intraoral approach.  Is that a fair and accurate

22   description?

23              THE COURT:  Sustained, sustained.  It is what it

24      is.  It's not for the witness to interpret if you're going

25      to read it.

Matos – by Plaintiff – Direct

1          MR. HACKWELDER:  All right.

2    BY MR. HACKWELDER:

3      Q     After up left the hospital, where did you go?

4      A     My parents picked my up.  I left to my parent's house.

5      Q     And how long did you stay with your parents?

6      A     I stayed with my parents approximately, I would say,

7    about four months.  I couldn't be on my own.

8      Q     How were you feeling during that time?

9      A     I was in a lot of pain.  I couldn't eat, I couldn't

10   brush my teeth, I couldn't talk.

11     Q     Why couldn't you eat, brush your teeth or talk?

12     A     My mouth was wired shut.

13     Q     For how long was your mouth wired shut?

14     A     It was approximately, I would say, four months wired

15   shut, eating can liquid foods.

16     Q     Did you lose any weight during that time?

17     A     Yes, I did, I lost about 40 pounds.

18     Q     Were you working during that time?

19     A     Not for the first three months I wasn't.  After that I

20   went back to work on certain conditions.

21     Q     Can you describe what those conditions were?

22     A     Well, I couldn't talk on the phone and I really

23   couldn't talk to my peer co-workers because my mouth was wired

24   still.

25     Q     Did you have any additional medical treatment?

Matos – by Plaintiff – Direct

1    A    Yes, I did.

2    Q    What additional medical treatment did you have?

3    A    I had a second procedure done and it was to remove the

4  metal plate.  The doctors thought that I was healing pretty

5  good so they had -- they wanted to remove -- it was either to

6  stay with -- either to stay with the metal bracket permanent or

7  if I healed they will remove it, so they decided I was healing,

8  so they removed it.

9    Q    Was your jaw no longer shut after this?

10    A    I'm sorry?

11    Q    I assume your jaw was no longer shut after that

12  operation.

13    A    Yes.

14         THE COURT:  When was it?

15  BY MR. HACKWELDER:

16    Q    Do you recall approximately when that operation was?

17    A    It was, I would say, probably on the sixth month.

18    Q    Following the operation, did you have any additional

19  treatment?

20    A    Yes, I did.

21    Q    What kind of treatment did you have?

22    A    I had therapy.

23    Q    What did the therapy consist of?

24    A    Therapy consisted of me trying to get strength to bite

25  again and to learn how to basically eat, so they were

64
Matos – by Plaintiff – Direct

1   stretching my mouth to make sure that I had a good open bite to

2   bite on certain foods.

3        Q    How often did you go to therapy?

4        A    Once a week.

5        Q    How long did each of those sessions last?

6        A    It lasted close to an hour.

7        Q    For how long did undergo the treatment?

8        A    Close to nine months I would say.

9             MR. HACKWELDER:  Your Honor, I'm going to show

10        the witness what's been marked for identification purposes

11        as Exhibit 2B.

12             THE COURT:  Is this also on the USB?

13             MR. HACKWELDER:  I was going to publish it on

14        USB.  I believe I have a hard copy for Your Honor if you'd

15        like.

16             THE COURT:  I don't need it, but do you have a

17        hard copy for the jury?

18             MR. HACKWELDER:  Well, I think they can see it on

19        the screen.

20             THE COURT:  At some point they'll be deliberating

21        and it might be helpful.

22   BY MR. HACKWELDER:

23        Q    Mr. Matos, I'm showing you what's been marked for

24   identification purposes as Plaintiff's Exhibit 2B.  Do you

25   recognize what's depicted in that photograph?

Laura L. Ludovico, SCR

A.121

D_000491

Matos – by Plaintiff – Direct

1    A    Yes.

2    Q    What's depicted in that photograph?

3    A    That was after my surgery was done.

4    Q    Who took this photograph?

5    A    I believe it was a friend of mine.

6             THE COURT:  Was that after the first surgery or

7    after the second surgery?

8             THE WITNESS:  This was the first.

9    BY MR. HACKWELDER:

10   Q    Mr. Matos, does that picture fairly and accurately

11   depict the condition of your face following the first surgery?

12   A    Correct.

13            MR. HACKWELDER:  Your Honor, plaintiff moves to

14   introduce this Exhibit 2B into evidence.

15            THE COURT:  How long after the first surgery was

16   this photograph taken?

17            THE WITNESS:  It was approximately -- it was the

18   next day?

19            THE COURT:  The next day?

20            THE WITNESS:  Yes.

21            THE COURT:  Any objection to its admission into

22   evidence, Mr. Zeitlin?

23            MR. ZEITLIN:  Nothing other than what was

24   objected to --

25            THE COURT:  All right.  Any objections are

Matos - by Plaintiff - Direct

1        overruled.

2                  It's received and being deemed marked in evidence

3        Plaintiff's 2B.

4                  (WHEREUPON, Plaintiff's Exhibit 2A was deemed

5              received in evidence.)

6                  MR. HACKWELDER:  I have one more photograph.

7                  THE COURT:  Sure.

8    BY MR. HACKWELDER:

9        Q    I'm going to show you, Mr. Matos, what's been marked

10   for identification as Plaintiff's Exhibit 2C.  Do you recognize

11   what's depicted in this photograph?

12       A    Yes, I do.

13       Q    What's depicted in this photograph?

14       A    Can you repeat that?

15       Q    What is depicted in this photograph?

16       A    I'm sorry?

17                 THE COURT:  What does the photo show?

18                 THE WITNESS:  The photo shows that same day after

19       my surgery.  It shows my other side, the damage that it --

20       that was done.

21                 THE COURT:  Is this your right cheek?

22                 THE WITNESS:  Yes.

23                 THE COURT:  Okay, right cheek.

24                 After the first surgery, right?

25                 THE WITNESS:  Correct.

A.123

D_000493

Matos – by Plaintiff – Direct

1    BY MR. HACKWELDER:

2       Q     And is this a fair and accurate depiction of how your

3    cheek right cheek looked a day after your surgery?

4       A     Correct.

5              THE COURT:  Any objection to it being moved into

6       evidence, any objection is overruled.  2C in evidence.

7              Next question.

8              (WHEREUPON, Plaintiff's Exhibit 2A was deemed

9               received in evidence.)

10   BY MR. HACKWELDER:

11      Q     Mr. Matos, as you sit here today how does your jaw

12   feel?

13      A     I still feel discomfort, I still feel a little pain.

14      Q     Can you describe the discomfort and pain that you

15   have?

16      A     Sure.  One of my biggest discomfort is that I have

17   permanent damage to my left-hand side, so I don't feel my left

18   side cheek due to nerve damage.

19      Q     Okay.  Mr. Matos, going back to the day of the

20   incident, did you consume any alcohol that day?

21      A     No, I did not.

22      Q     Did you use any elicit drugs?

23      A     No, I didn't.

24              MR. ZEITLIN:  Your Honor, I object to this

25       testimony.  He's talking about nerve damage and --

68

Matos - by Plaintiff - Direct

1          THE COURT:  It still doesn't matter.  Your

2     objection is overruled.

3          MR. HACKWELDER:  Your Honor, I have no further

4     questions.

5          Thank you, Mr. Matos.

6          THE COURT:  I have a question if you don't mind.

7          Could you explain to us with a little more detail

8     the physical therapy you went through?

9          THE WITNESS:  Sure.  So once they took the

10    bracket off, they had to take the wires off, so what they

11    had to do was in order for me to try to learn how to bite

12    again, they had some type of tool to stretch my mouth up

13    and down, so it had to get to a certain centimeter for me

14    to bite on certain things.  So once they gradually get to

15    that centimeter, then I was okay, but at the beginning I

16    was only opening my mouth maybe about two or three

17    centimeters.

18         THE COURT:  And then what happened, as your

19    therapy progressed you would open it further and further

20    with this machine -- with this equipment.

21         THE WITNESS:  Right.

22         THE COURT:  Was that painful at all?

23         THE WITNESS:  Yes, it was.

24         THE COURT:  At the time of the process was it

25    painful when they were using this equipment to open your

A.125

D_000495

Matos – by Plaintiff – Direct

1    mouth?

2              THE WITNESS:  Definitely because I wasn't used to

3    opening my mouth so they were stretching it.

4              THE COURT:  Where was the pain?

5              THE WITNESS:  In the jaw itself, yes.

6              THE COURT:  All right.  Did you take anything for

7    the pain or were you prescribed anything for the pain at

8    that time?

9              THE WITNESS:  Yes, they gave me Motrin.

10             THE COURT:  Motrin?

11             THE WITNESS:  Yes, it was prescribed.

12             THE COURT:  All right.  Okay, fine.

13             Cross-examination?

14             MR. ZEITLIN:  Yes, Your Honor.

15             THE COURT:  Let me just ask one more question.

16             When you were going through this therapy, did you

17   have exercises to do at home also?

18             THE WITNESS:  Yes.

19             THE COURT:  How would you do the exercises at

20   home?

21             THE WITNESS:  I was just trying to -- opening my

22   mouth, so at the same time I have rubber bands that were

23   tied into the bracket so I wouldn't extend my mouth so

24   much.

25             THE COURT:  When you were having this therapy and

70
Matos - by Plaintiff - Direct

1    doing these exercises were you able to eat solid food or

2    were you still on the liquid diet?

3            THE WITNESS:  Once they took off the bands I was

4    eating small portions of solid food.

5            THE COURT:  And how long did you have to limit

6    your food like that?

7            THE WITNESS:  Maybe two months.

8            THE COURT:  Two months after they took the metal

9    out of your mouth.

10           THE WITNESS:  Right, I started gradually eating

11   solid foods, but small solid foods.

12           THE COURT:  All right.

13           Mr. Zeitlin?

14           MR. ZEITLIN:  Yes, Your Honor.

15           THE COURT:  Mr. Zeitlin, I'm sorry, it's

16   lunchtime.  We have a contract that we need to abide by and

17   so consequently we'll break for lunch at this time and see

18   everybody back at 2:15.

19           Members of the jury, remember the instructions;

20   not to do any research or speak to anybody about the case

21   if you see us in the hallway or the street, all right?

22           Thank you very much.

23           THE COURT OFFICER:  All rise.

24           (Jurors exited the courtroom.)

25           (WHEREUPON, there is a luncheon recess taken and

Matos – by Plaintiff – Direct

1        the case adjourned to 2:15 p.m.)

2                    A F T E R N O O N   S E S S I O N

3            MR. ZEITLIN:  Your Honor, before you bring in the

4    jury I wanted to make an objection outside the ears of the

5    jury.

6            THE COURT:  All right, go ahead.

7            MR. ZEITLIN:  All right.  I object to the Court's

8    questioning of the plaintiff in this case.  I know the

9    Court has discretion in that regard, but I objected to the

10   non-bifurcation of this trial and the Court extensively

11   questioned -- buttressed the plaintiff's counsel's

12   questions and answers from the plaintiff regarding the

13   plaintiff's injury and I think it left an impression on the

14   jury that the Court was favorable towards the plaintiff in

15   this case, and I would mention that the plaintiff has a

16   very competent attorney.  I sort of felt like there was two

17   attorneys for the plaintiff.  I object to those -- an

18   extensive amount of questions.

19           The other matter I wanted to bring up --

20           THE COURT:  Well, let me respond that.

21           While you're quite right, the Court does have

22   wide and broad latitude bringing facts out before a jury in

23   the search for the truth, the characterization of my

24   questions as extensive, I disagree with and -- well, I'll

25   leave it at that.  I don't think any court of appellate

Laura L. Jodovico, SCR

A.128                    D_000498

72

Matos - by Plaintiff - Direct

1       review would consider anything I did in this case extensive

2       and frankly, I've had far longer examinations and

3       cross-examinations of witnesses which were met with

4       approval by all higher authorities.

5               What's your other objection?

6               MR. ZEITLIN:  I respectfully except.

7               The other objection is I objected to the Court

8       allowing in some judgment between 161 West 108th Street

9       Tenant's Association against Juan Hiraldo, which is the

10      father of the defendant.  I renew my previous objections.

11      And then I'm curious under what theory of law this is going

12      to be admitted under.

13              THE COURT:  If you recall our earlier discussions

14      that were off the record, which were to the effect that I

15      indicated I would admit the events that occurred with

16      respect to this landlord matter because it is a fact in the

17      situation and something known with both party's history.  I

18      was under the impression, apparently mistaken, that rather

19      than put the record into evidence, you were going to

20      stipulate as to what that record said and Mr. Hackwelder or

21      yourself would be able to comment on it.  You chose this

22      morning not to do that.

23              MR. ZEITLIN:  Yes, Your Honor, and I don't

24      understand how it could possibly be admitted under any

25      theory of law that I'm aware of as evidence in this

Laura L. Jodovico, SCR       A.129       D_000499

Matos – by Plaintiff – Direct

1    particular case.

2                    THE COURT:  All right.

3                    MR. ZEITLIN:  I'm not responsible for my dad's

4    actions and --

5                    THE COURT:  I'm sorry, what?

6                    MR. ZEITLIN:  I said we're not responsible for

7    our parents' actions.

8                    THE COURT:  No, but this is a fact of a history

9    between the parties that goes back a number of years.

10                    All right.  Mr. Hackwelder, I see you have your

11    hand up, would you like to say something?

12                    MR. HACKWELDER:  Yes, Your Honor.  I didn't think

13    that this was going into evidence.

14                    THE COURT:  It's not.

15                    MR. HACKWELDER:  Right.  We said that we were

16    going to work on the language of what you were going to

17    take judicial notice of.

18                    THE COURT:  Right.

19                    MR. HACKWELDER:  I simply sent an e-mail so both

20    the Court and counsel would have what we were referring to.

21    I think it was printed out so everybody would have it in

22    front of them so that when we discuss what exactly is going

23    to be told to the jury, we have something to base it off

24    of.  That's simply why this document appeared.

25                    THE COURT:  Can you put on the record what it is

74

Matos – by Plaintiff – Direct

1      that you intend to put before the jury with respect to this

2      matter?

3              MR. HACKWELDER:  Well, the court reporter has it

4      right now.  I think she wanted to take down the caption.

5      I'm fine with just saying that there was a landlord-tenant

6      action where a stipulation was entered into that reflected

7      that Juan Hiraldo, the defendant's father, acknowledged or

8      it was stipulated that he owed back rent.  I don't even --

9      I'm fine even -- you know, if you want to avoid saying

10     exactly the number --

11             THE COURT:  No.

12             MR. HACKWELDER:  -- I'm fine with avoiding that.

13     Say just it was stipulated between the tenant's association

14     and Juan Hiraldo that he owed back rent for the rent of the

15     commercial space.

16             MR. ZEITLIN:  I object to any stipulation or

17     anything to do with this action by this board against Juan

18     Hiraldo and I don't see how it could legally get into

19     evidence in this particular case.

20             (Brief pause in the record.)

21             THE COURT:  Mr. Hackwelder, the Court is

22     reviewing this order from the Landlord-Tenant Court.  It

23     also indicates that in the event the respondent, which, of

24     course, is the defendant's father, vacated the commercial

25     premises on a certain date, that they would waive the rent

Matos – by Plaintiff – Direct

1     arrears due.  Do you have any problem advising the jury of

2     that?

3              MR. HACKWELDER:  No.  Judge, if you want to

4     include that he owed money, he came to an agreement that as

5     long as he left within a certain amount of time, they would

6     waive the money that he owed.

7              THE COURT:  That's fine.  I don't want the jury

8     to be left with the impression that Mr. Hiraldo's family

9     owes anybody any money.

10             MR. HACKWELDER:  I'm fine with that, Your Honor.

11    I think it's fair.  That's what the document states.  I'm

12    not looking for anything outside of what actually happened.

13             THE COURT:  All right.

14             MR. ZEITLIN:  Your Honor, I just want the record

15    to be clear that anything the Court allows in regarding

16    this is objectionable and it's reversible error as far as

17    I'm concerned.

18             THE COURT:  Well, as far as I'm concerned, it's

19    not reversible error, so, of course, your objection is

20    overruled.  You have an exception.

21             MR. HACKWELDER:  I don't have any objection,

22    Judge.  I think we've gone the length on this matter.

23             THE COURT:  All right.  Are we ready for the

24    jury?

25             MR. ZEITLIN:  Yes, Your Honor.

76
Matos - by Plaintiff - Cross

1                  THE COURT:  All right.  So, Mr. Matos, come back

2        up.

3                  And, Officer, we can get the jury.

4                  (Witness resumes the witness stand.)

5                  THE COURT OFFICER:  All rise, jury entering.

6                  (Jurors entered the courtroom.)

7                  THE COURT:  All right.  Please be seated.

8                  All right members of the jury, you'll recall we

9        were just about to start the cross-examination of the

10       plaintiff, Mr. Matos, by Counsel Mr. Zeitlin.

11                 MR. ZEITLIN:  Thank you, Your Honor.

12   CROSS-EXAMINATION

13   BY MR. ZEITLIN:

14       Q    Good afternoon, Mr. Matos.

15       A    Good afternoon.

16       Q    I believe you testified on direct that you have a job

17   for a number of years working in accounting.

18       A    Correct.

19       Q    And I believe you said you were out of work for two

20   months or four months.

21       A    Close to three months out of work.

22       Q    How many months?

23       A    Close to three.

24       Q    Three months, okay.

25                 Well, where do you live?

Laura L. Lodovico, SCR

A.133                                    D_000503

Matos - by Plaintiff - Cross

1       A       Excuse me?

2       Q       What's your address?

3       A       Relocation or permanent?

4       Q       Your permanent address.

5       A       161 West 108th Street, Apartment 2N, New York, New

6    York 10025.

7       Q       Are you back in that apartment yet?

8       A       No.

9       Q       Okay.  Do you know when the people will be back in the

10   apartment?

11      A       Not as of now, no.

12      Q       Okay.  Now, how do you know Steven Hiraldo?

13      A       A neighbor in the building.

14      Q       And I believe you said that you were born in this

15   building.

16      A       Correct.

17      Q       To your knowledge, was Mr. Hiraldo also born in this

18   building?

19      A       Not too sure.

20      Q       How many years do you think mr. Hiraldo has lived in

21   the building?

22      A       He's younger than me, so I'm not sure when he actually

23   came into the building.

24      Q       Would I be fair in stating approximately 20 years or

25   more?

Matos - by Plaintiff - Cross

1      A    Yes, possibility, yes.

2      Q    Now, have you ever had a disagreement with Mr. Hiraldo

3  before December 25th of 2015?

4      A    Not that I recall.

5      Q    Did you ever accuse him or his family of any

6  wrongdoing before that date?

7      A    No.

8      Q    Did he ever accuse you of anything before that date?

9      A    No.

10     Q    Was there ever an incident where you accused him of

11 saying bad things about you before that day?

12     A    No.

13     Q    So it's your testimony that you got along fine with

14 Mr. Hiraldo?

15     A    Can you repeat that?

16     Q    It's your testimony that you get along fine with

17 Mr. Hiraldo or you had gotten along with him?

18     A    You got to repeat that again because --

19     Q    It's your testimony that you had gotten along with

20 Mr. Hiraldo before December 25th of 2015?

21     A    I wouldn't say gotten along, it was just acquaintance,

22 hi and bye.

23     Q    You had no bad ill blood with him?

24     A    What?

25     Q    You had no bad feelings with him?

Matos – by Plaintiff – Cross

1      A      No.

2      Q      Now, I'm going to call you're attention to Christmas

3  Eve, December 24th of 2015.  You got up in the morning and you

4  went to work; is that correct?

5      A      Correct.

6      Q      What time did you leave work?

7      A      I left work about 4:00.

8      Q      Now, when you left work, what did you do?

9      A      I went home, showered up and then I went downstairs to

10  meet a friend.

11      Q      And who was the friend that you met?

12      A      His name was Luis Ferrer.

13      Q      And when you met Luis Ferrer, where did you go?

14      A      After I met him, I went to the bar around the corner

15  on 109th Street.  That's the street where it's located.

16      Q      And who were you with when you went to that bar on

17  that day?

18      A      I was with Luis Ferrer and some his acquaintances.

19      Q      Approximately how many people were you with?

20      A      I would say two to five.

21      Q      Excuse me?

22      A      Two to five.

23      Q      Two to five?

24      A      Total five.

25      Q      Total five.

80

Matos - by Plaintiff - Cross

1          And were these people all drinking.

2      A   I'm sorry?

3      Q   Were these people all drinking?

4      A   They were.  Yes, they were drinking.

5      Q   They were all drinking.  Were you drinking?

6      A   No.

7      Q   What was the reason you weren't drinking?

8      A   Well, I had a responsibility to take care of the

9  commercial space when the activity was going on.

10     Q   So because you had this responsibility you refrained

11  that evening from drinking?

12     A   Correct.

13     Q   And you got to the bar at what time?

14     A   I got to the bar, it was around 7:00.

15     Q   And what time did you leave the bar?

16     A   It was a couple of hours.  I would say about nine,

17  ten, around like nine, ten.

18     Q   Would I be fair in stating you were in the bar

19  approximately three hours?

20     A   I'm sorry?

21     Q   Did you testify previously that you were in the bar

22  for three hours?

23     A   Correct.  About approximately three hours.

24     Q   Now, there came a time after you left the bar that you

25  went where?

Matos - by Plaintiff - Cross

1    A    I went to the commercial space, the activity, the

2  party that was going on.

3    Q    You went directly to the commercial space?

4    A    Correct.

5    Q    Were you invited to that party?

6    A    If I was invited to that party?

7    Q    Were you invited that that party?

8    A    No, I was not invited.  I was actually chaperoning the

9  party.

10    Q    Well, who asked you to chaperone the party?

11    A    Well, from the president, he asked me since I was

12  staying around, so I decided to stay around and chaperone.

13    Q    You decided to chaperone?

14    A    Well, it was from the president, he asked me to

15  chaperone, so I stood around.

16    Q    What's the name of the president that asked you to

17  chaperone the party?

18    A    His name is Mr. Rafael Padrone[ph].

19    Q    Why did this party need you to be a chaperone?

20    A    I'm sorry?

21    Q    Why did this party need you to be a chaperone?

22    A    We always do that in all activities.  It's not the

23  first time.

24    Q    Whose party was it?

25    A    It was the president's nephew's son.

82

Matos - by Plaintiff - Cross

1    Q    Was that the same Luis Ferrer that you were drinking

2    with earlier?

3    A    Correct.

4    Q    So why did you say he was the president's nephew's

5    son, it was your friend's party, Luis Ferrer, right?

6    A    It was his son's.

7    Q    His son's party, okay.

8    A    So it was more the majority of his friends, which is

9    an age bracket.  There's a difference of an age bracket.

10    Q    Were people drinking at this party?

11    A    Correct.

12    Q    Were they using other drugs such as marijuana at this

13    party?

14    A    If there was, they were outside.

15    Q    Did you notice anyone, since you were the chaperone,

16    using marijuana outside?

17    A    I'm sorry?

18    Q    Did you testify previously that you saw other people

19    using marijuana outside the party?

20    A    Yes, I did.

21    Q    Did you do anything about the illegal use of marijuana

22    at the party?

23    A    No, there were no violence.

24    Q    Now, did you see Steven Ferraro[sic] that evening or

25    that day?

Laura L. Iodovico, SCR

A.139

D_000509

Matos – by Plaintiff – Cross

1    A    What?

2    Q    Did you see the Defendant Steven Ferraro[sic]?

3    A    You mean Steve Hiraldo?

4    Q    Hiraldo, I'm sorry.

5    A    If I saw him that day?

6    Q    Yes, Christmas Eve, Christmas day, 2015.

7    A    Yes.

8    Q    What was the first time you saw Steven Hiraldo?

9    A    It was almost close to -- I would say almost close to

10   1:00 in the morning.

11   Q    How did you come to see Steven Hiraldo?

12   A    Looks like he was coming from somewhere else and he

13   passed by.

14   Q    When you say "he passed by," where did he pass by?

15   A    Well, he went inside and greeted some people and then

16   went outside.

17   Q    He greeted some people.  Where did he greet some

18   people?

19   A    Inside the commercial space, the party.

20   Q    Did you talk to him when you saw him inside the party?

21   A    Nope.

22   Q    Did you he stay inside the party?

23   A    Nope.

24   Q    After you saw him inside the party, did you ever see

25   him again?

Matos - by Plaintiff - Cross

1       A    After when I had the argument outside, that's when I

2    saw him again.

3       Q    Now, how did you come to see him outside, what

4    happened?

5       A    Well, he had a dispute with somebody, he had an

6    argument with somebody.

7       Q    Well, that's a conclusion.  How did you come to know

8    he was having a dispute with somebody?

9       A    Well, somebody said that there was an argument outside

10   and I stepped out to diffuse the argument.

11      Q    When you stepped outside, did the person that told you

12   about the argument step outside with you?

13      A    I'm sorry?

14      Q    Did the person that told you about the argument go

15   outside and show you --

16      A    No.

17      Q    -- where the argument was?

18      A    No.

19      Q    When you went outside, who, if anybody, was outside

20   the building?

21      A    Who was --

22      Q    Outside 161 West 108th Street.

23      A    It was only two people.

24      Q    Who were those two people?

25      A    The two people arguing and then when I came outside,

Matos – by Plaintiff – Cross

1    so total three.

2         Q    I just want to get something.

3                   (Brief pause in the record.)

4                   THE COURT:  I'll ask you, who were those people?

5                   THE WITNESS:  I'm sorry?

6                   THE COURT:  Who were the people that were

7         outside?

8                   THE WITNESS:  Steve Hiraldo, Elaine Candelario,

9         Raul Matos.

10   BY MR. ZEITLIN:

11        Q    Now, Mr. Matos, when you went outside, you went

12   outside the door for this special place where the party was; is

13   that correct?

14        A    Can you repeat that?

15        Q    When you went outside did you leave the party door

16   where the party was, the commercial space?

17        A    If I came out through the side door?

18        Q    Where did you come outside of the building when you --

19        A    Through the side door of the commercial space.

20        Q    I'm going to show you a document that's been marked as

21   Defendant's A for identification.  Do you see this picture?

22        A    Yes, I do.

23        Q    What does this picture show?

24        A    This picture shows the building as it is right now,

25   remodeled.

Matos - by Plaintiff - Cross

1    Q    Okay.  And would I be fair in stating that there were

2 two doors in the picture that were both there on Christmas Day

3 of 2015?

4    A    Correct.

5    Q    And would I be fair in stating that I'm pointing to a

6 door over here with three steps going down is the door from the

7 commercial space, the door you left from?

8    A    Yes, those are the three steps, correct.

9    Q    And would I be fair in stating that this other door is

10 the main door to the building?

11    A    Correct.

12    Q    Now, I'm going to go back and I'm not sophisticated

13 with this, but I will get you back there.

14              (Brief pause in the record.)

15    Q    So you left that door by the commercial space and you

16 heard an argument?

17    A    Say that again.

18    Q    You left the commercial space and you heard an

19 argument; is that your testimony?

20    A    Well, my testimony was that somebody -- I heard

21 somebody say something and I came outside.

22    Q    When you came outside, what did you see and hear?

23    A    I saw two people arguing.

24    Q    Okay.  And what did you do?

25    A    I went to diffuse the argument.

1    Q    So you went to diffuse the argument?

2    A    Right, I went up and -- yes.

3    Q    So you walked from the commercial space door over to

4    the main door of the building where Mr. Hiraldo was --

5    A    Of course --

6    Q    -- is that correct?

7    A    -- that's how I'm going to get there.

8    Q    Is that correct?

9    A    Correct, yes.

10   Q    And would I be fair in stating that there's a landing

11   and stairs going up to the main door of the building?

12   A    Correct.

13   Q    And would I be fair in stating that Mr. Hiraldo was

14   standing on the landing?

15   A    No, he was standing at the top of the stoop.  There's

16   a stoop on the -- there's a -- there's a stoop before you walk

17   into the door.

18            THE COURT:  Is it fair to say he was at the top

19       of the stairs in front of the door?

20            THE WITNESS:  Yes.

21            THE COURT:  Next.

22   BY MR. ZEITLIN:

23   Q    Would I be fair in stating he was standing right here

24   in front of the door?

25            THE COURT:  He just said.  Next question.

Matos – by Plaintiff – Cross

1      A     Correct.

2      Q     Now, where was that woman that you say he was arguing,

3   with?

4      A     Right.

5             THE COURT:  She was there as well?

6   BY MR. ZEITLIN:

7      Q     Where was she?

8      A     She was -- you see where the elevator is at right now,

9   that's where she was at.

10     Q     No, I don't see an elevator?

11     A     Well, that side -- well, the side that you show in the

12  picture is an elevator, so you see the -- you see -- you see

13  the guardrails, so you don't see the back of the guardrails

14  through the elevator there, so she was standing on the back of

15  the -- on the back?

16     Q     Was she also on the same landing Mr. Hiraldo was on?

17     A     No, she wasn't.

18     Q     She wasn't on this porch here?

19     A     She was on the landing, Mr. Hiraldo was on the step.

20     Q     Okay, well --

21     A     You can't see it from this picture.  If you were to

22  bring up another picture, you'll see.

23             THE COURT:  Was he on the step going into the

24     building or a different step?

25  BY MR. ZEITLIN:

89
Matos - by Plaintiff - Cross

1    Q    I'm going to show what you was marked for

2  identification --

3              THE COURT:  Withdrawn.

4  BY MR. ZEITLIN:

5    Q    -- as Defendant's B in evidence.  Does this picture

6  help you a little better.

7    A    You can't see -- you can't see the stoop entering the

8  building.  There's only one stoop before you enter the building

9  on the door.

10    Q    All right.  So you left this door and you went over to

11  talk to Mr. Hiraldo over by this door?

12    A    Correct.

13    Q    Did there come a time that you went up the stairs to

14  talk to Mr. Hiraldo?

15    A    That I when up the stairs and talked to Mr. Hiraldo?

16    Q    The stairs here where Mr. Hiraldo was.

17    A    I did not talk to Mr. Hiraldo.

18    Q    Did you talk to Mr. Hiraldo?

19    A    No.

20    Q    Didn't you testify that when you went there you went

21  to diffuse this argument?

22    A    Right, I actually questioned him and he --

23    Q    Well, what did you say to Mr. Hiraldo when you went

24  over to Mr. Hiraldo?

25    A    What did I say to Mr. Hiraldo?

90

Matos - by Plaintiff - Cross

1    Q    Yes, what did you say to him?

2    A    All I said, what's going on, why -- what's going on?

3    Q    So you did have a conversation with him?

4    A    It was towards both.  You said Mr. Hiraldo.  I was

5    talking to Ms. Candelario and Mr. Hiraldo.

6    Q    Okay.  Did you ever see Mr. Hiraldo hit this woman or

7    do anything of that nature?

8    A    No, they were having an argument, but there was hand

9    gestures going on.

10   Q    Why was it your business if they were having an

11   argument or having a conversation?

12   A    They wasn't having a conversation, it was an argument.

13   Q    An argument is a conclusion.  Why did you think it was

14   an argument, because their voices were raised?

15   A    Right, and there were hand gestures and there was

16   screaming, so it was a scandal in front of the building.

17   Q    It was a scandal?

18   A    Correct.

19   Q    So when you asked Mr. Hiraldo and Ms. Candelario

20   what's happening, did anyone answer you?

21   A    Yes, Mr. Hiraldo did.

22   Q    What did he say to you?

23   A    Well, he said was my family taking funds from the

24   building?

25   Q    And what did you say?

Laura L. Ludovico, SCR

A.147

D_000517

91

Matos - by Plaintiff - Cross

1    A    I said yes.

2    Q    Do you know why Mr. Hiraldo would say that to you when

3    he's having an argument with another person?

4    A    I'm not sure.  The argument was with him and -- was

5    with Ms. Candelario and as soon I you got there his anger

6    geared towards me and he asked me the question.

7    Q    So you're telling this jury that this man, the

8    defendant, was having an argument with a woman on the top of

9    these stairs and you go over and say what's happening and he

10   immediately says are you accusing my family of stealing money

11   and you then you said yes and then after you said yes, what

12   happened?

13   A    Repeat that again.

14   Q    I said it's your testimony --

15   A    Right.

16   Q    -- that you walked from one door over to the other

17   door.  Now, where were you, on the bottom of stairs when you

18   asked --

19   A    No, I was on the landing.  I went up to the landing.

20   Q    So you went all the way up the landing, so now there's

21   three people on this landing?

22   A    Correct.

23   Q    You, Ms. Candelario and Mr. Hiraldo?

24   A    Correct.

25   Q    I'm going back to Defendant's A.  Would you agree that

92

Matos – by Plaintiff – Cross

1   this is not a large landing?

2       A    No, it's a small landing.

3       Q    Now, when you went up the stairs to the landing, what

4   was the purpose of you going up the stairs to the landing?

5       A    Like I said, it was to diffuse the argument.

6       Q    What were you going to do by going up the stairs to

7   diffuse the argument, there was nothing physical going on?

8       A    Well, I was trying to stop them.  It was a scandal in

9   front of the building.

10      Q    Couldn't you talk to them from the bottom of the

11  stairs?

12      A    I decided to go on the landing and talk to them.

13      Q    So you decided to go up the stairs on the landing.

14  How close were you when you went up the stairs on the landing

15  to Mr. Hiraldo.

16      A    Maybe about a foot.  Closer than that probably.  It's

17  a small space.

18      Q    And then what happened?

19      A    After?

20      Q    After you went up and you -- were you face to face

21  with Mr. Hiraldo?

22      A    After I went up, I diffused --

23      Q    You diffused the --

24      A    They were arguing.

25      Q    How did you diffuse the argument?

Matos - by Plaintiff - Cross

1    A    Well, I just asked the question.  That's all I did was

2    I asked what's going on and there was a question geared towards

3    me after that.

4    Q    What were the other questions geared towards you?

5    A    The other question was did my parents take funds from

6    the building?

7    Q    I thought you said that was the first question

8    Mr. Hiraldo asked you.

9    A    No, Mr. Hiraldo -- well, that was the only question he

10   asked.

11   Q    You said yes, then what happened?

12   A    I told you this again.  I said yes.

13   Q    Again, you told him yes?

14   A    There was a silence and once there was a silence, I

15   turned towards my left, I was about to take the first step down

16   the stairs.  Once I was going to take that first step down the

17   stairs, I was sucker punched on the back right side of my head.

18   Q    Now, Mr. Matos, you want this jury to believe that you

19   went on Christmas Eve to a bar for three hours with friends

20   that were drinking and you had nothing to drink and then you

21   went to a party for another couple of hours where people were

22   drinking and you had nothing to drink at that party and then

23   you want the jury to believe that you confronted Mr. Hiraldo

24   and for the first time ever he asked you if his parents were

25   stealing money?

Matos - by Plaintiff - Cross

1    A    You said for the first time ever?

2    Q    Ever, yes?

3    A    Okay.

4    Q    Is that true?

5    A    I don't know how to answer that question.  He said

6    "for the first time ever."  I don't believe that's the first

7    time.

8    Q    You told me you never had a disagreement with

9    Mr. Hiraldo.

10   A    No, I never did.

11   Q    So is this the first time you have a disagreement with

12   him about accusing his family of stealing money?

13   A    Yes.

14   Q    And it just happened when you went over to diffuse

15   some argument?

16   A    That is correct.

17   Q    And over these 20 years prior you never had any other

18   disagreement with him?

19   A    No.

20   Q    And you never struck Mr. Hiraldo or did anything

21   untoward?

22   A    Never touched him.

23   Q    You turned around and when you turned around where was

24   Ms. Candelario?

25   A    When I turned around and I was about to take the first

Matos - by Plaintiff - Cross

1   step, I was struck, I was sucker punched in the back of my

2   head.  Once I was sucker punched, my left side struck the

3   guardrail which had two things sticking out and it hit my

4   cheek.  After that Ms. Elaine was trying to hold me from

5   falling, but at the same time trying to stop him from hitting

6   me because he was still swinging while I was falling.

7       Q    Would I be fair in stating that you testified

8   previously that you never saw Mr. Hiraldo hit you?

9       A    Excuse me?

10      Q    Did you testify previously that you never saw

11  Mr. Hiraldo hit you?

12              THE COURT:  That's not inconsistent.  The

13          objection is sustained.  That's not how you use a

14          deposition either, but go ahead.

15  BY MR. ZEITLIN:

16      Q    Did you testify at a deposition on October 23, 2018,

17  under oath?

18              THE COURT:  You testified at a deposition, an

19          examination before trial, at some point, right?

20              THE WITNESS:  I'm sorry?

21              THE COURT:  You testified at a deposition in

22          probably a lawyer's office somewhere about that case

23          before, correct?

24              THE WITNESS:  Yes.

25              THE COURT:  And you were put under oath?

Laura L. Iodovico, SCR

A.152

D_000522

Matos – by Plaintiff – Cross

1                    THE WITNESS:  Yes.

2                    THE COURT:  And you were asked questions?

3                    THE WITNESS:  Yes.

4                    THE COURT:  And there were answers, you gave

5          answers?

6                    THE WITNESS:  Yes.

7                    THE COURT:  And you had a lawyer there?

8                    THE WITNESS:  Yes.

9                    THE COURT:   there was a lawyer for the other

10         side?

11                   THE WITNESS:  Yes.

12                   THE COURT:  There was probably a court reporter

13         there.

14                   THE WITNESS:  Yes.

15                   THE COURT:  Let me explain to the jury what I'm

16         talking about.

17                   Members of the jury -- would you sit down, I'm

18         trying to talk to the jury?

19                   What counsel is referring to is known as an

20         examination before trial.  You probably heard about them.

21         They occur in all cases of this nature where what happens

22         is what I just asked the witness:  Witnesses are called on

23         both sides, there are lawyers there asking questions, the

24         witness has a lawyer there representing him, there's a

25         court reporter there who takes the minutes and she types up

Matos – by Plaintiff – Cross

1    a transcript.  Counsel are entitled to refer to that during

2    the course of a trial, which usually happens some months or

3    years later, which is what's happening now.

4              Generally, how an examination before trial is

5    used is the attorney asks a witness, trying to point out an

6    inconsistency in his testimony, isn't it true that on the

7    day of your deposition you answered this -- you made this

8    answer to this question?  And they read the question and

9    the answer and that's kind of it.  So that's what

10   Mr. Zeitlin is trying to do at this point, correct?

11             MR. ZEITLIN:  I wasn't until Your Honor --

12             THE COURT:  You're abandoning the effort?

13             MR. ZEITLIN:  Now I am.

14             MR. HACKWELDER:  Your Honor, I just object at

15   this point.

16             THE COURT:  Why?

17             MR. HACKWELDER:  Because he's never been asked if

18   he saw.  He just said b he was sucker punched.

19             THE COURT:  That's why I just sustained my own

20   objection and I said that was not inconsistent, so let's

21   hear the next question.

22             MR. HACKWELDER:  Thank you, Your Honor.

23             THE COURT:  All right.

24 BY MR. ZEITLIN:

25   Q    I think the first question is before I do this is did

98

Matos - by Plaintiff - Cross

1    you see Mr. Hiraldo hit you?

2        A    I had my back turned.

3                THE COURT:  So the answer is no?

4                THE WITNESS:  No.

5                THE COURT:  See how simple?

6    BY MR. ZEITLIN:

7        Q    Did you see Mr. Hiraldo hit you, yes or no?

8        A    No.

9        Q    All right.  Then I don't know have to ask you these

10   questions.

11               THE COURT:  See how easy?

12   BY MR. ZEITLIN:

13       Q    So after you fell to the ground you said you lost

14   consciousness.

15       A    Correct.

16       Q    How long did you lose consciousness for?

17       A    Couple of minutes.  I'm not too sure.

18       Q    To your knowledge, did Mr. Hiraldo come down the

19   stairs and hit you again or do anything to you?

20       A    Could you repeat that?

21               THE COURT:  Did Mr. Hiraldo hit you again after

22       that or was it just one punch?

23               THE WITNESS:  Once I -- I was unconscious on the

24       floor when -- when my cheek hid the guardrail.

25               THE COURT:  That's not the question.  Let me

Laura L. Ludovico, SCR

A.155

D_000525

Matos - by Plaintiff - Cross

1      rephrase it.

2                Do you know if Mr. Hiraldo hit you again after

3      that first punch?

4                THE WITNESS:  No, I'm not too sure, no.

5                THE COURT:  Okay.

6  BY MR. ZEITLIN:

7      Q    So it's your testimony that even though you know

8  Mr. Hiraldo for 20 years, this is the only time you ever had

9  any time of physical confrontation with him?

10     A    Correct.

11     Q    And that all you did was walk out of one portion of

12 the building, you walked over to him --

13               THE COURT:  You've asked this already.

14     Sustained.

15               MR. ZEITLIN:  It's cross-examination, Your Honor.

16               MR. HACKWELDER:  Objection.  Asked and answered.

17               THE COURT:  You can't ask the same question more

18     than once.  Asked and answered is what we call it.

19 BY MR. ZEITLIN:

20     Q    And it's your testimony that on this particular day

21 even though you were in bars and parties with alcohol, you had

22 nothing to drink?

23               THE COURT:  Sustained.  Asked and answered.

24               MR. HACKWELDER:  Asked and answered.

25               MR. ZEITLIN:  No further questions, Your Honor.

Matos - by Plaintiff - Cross

1           Oh, your Honor, I would offer --

2           THE COURT:  You want to move those photographs

3    into evidence?

4           MR. ZEITLIN:  Into evidence, yes.

5           THE COURT:  Any objection?

6           MR. HACKWELDER:  No objection, other than this is

7    not exactly the way it was the day of the accident or the

8    date of the incident.

9           THE COURT:  Well, ask your witness.  We'll mark

10   them in evidence and you can ask the question unless you

11   have a stipulation.  The reporter marked it already, right,

12   for identification?

13          MR. ZEITLIN:  I think they were marked already

14   for identification.  One is --

15          THE COURT:  So let the reporter mark it in

16   evidence.

17          MR. ZEITLIN:  If you want them on any redirect

18   I'll leave them here, counsel?

19          THE COURT:  I'll ask the question.

20          Mr. Matos, take a look at these photographs.  I

21   don't need to see them, you can look at them.  Is it fair

22   to say that's not exactly how that side of the street

23   looked on the day of the incident, correct?

24          THE WITNESS:  Correct.

25          THE COURT:  And what's different?

Matos – by Plaintiff – Cross

1            THE WITNESS:  The guardrail is different.

2            THE COURT:  Was the guardrail that was there

3      about the same height as the guardrail that's in the

4      photograph or different.

5            THE WITNESS:  No, it was a little taller.

6            THE COURT:  A little taller, okay.

7            THE WITNESS:  And on the guardrail, the things

8      were sticking out.

9            THE COURT:  There were things sticking out of

10     what, the top?

11           THE WITNESS:  Yes, the top, so the guardrail was

12     extend.  It wasn't flat like -- you see how it's flat here?

13           THE COURT:  Yes.  I think the word is finials.

14     Was there finials on top of the guardrail?

15           THE WITNESS:  Sorry?

16           THE COURT:  Describe what was on top of the

17     guardrail.

18           THE WITNESS:  Yes.

19           THE COURT:  So the guardrail was a little bit

20     taller at the time of the incident?

21           THE WITNESS:  Correct.

22           THE COURT:  There was something extending on the

23     top of the guardrail at the time of the incident, correct?

24           THE WITNESS:  Correct.

25           THE COURT:  Describe what that was.

Matos – by Plaintiff – Cross

1               THE WITNESS:  It was basically the bars were

2     sticking out.

3               THE COURT:  The bars were sticking out?

4               THE WITNESS:  Correct.

5               THE COURT:  And that was part of how it was made?

6               THE WITNESS:  Yes.

7               THE COURT:  Something is blue there, is that for

8     the elevator they put in?

9               THE WITNESS:  This?

10              MR. ZEITLIN:  Excuse me, Your Honor.

11              THE COURT:  Yes, what is that?

12              MR. ZEITLIN:  I believe the plaintiff used a

13    photograph --

14              THE COURT:  Please be quiet, Mr. Zeitlin.  Please

15    be quiet, Mr. Zeitlin while the witness is testifying.

16              What is the blue object on that photograph?

17              THE WITNESS:  That is an elevator.

18              THE COURT:  And that was temporarily put there

19    for the construction?

20              THE WITNESS:  Yes.

21              THE COURT:  Anything else in that photograph

22    that's different from the day of the incident?

23              THE WITNESS:  Besides the elevator and the

24    guardrail, no.

25              THE COURT:  Okay, very good.

23-01011-jpm    Doc 11-2    Filed 10/27/23    Entered 10/27/23 10:33:02    Exhibit Ex. B
- Trial Transcript    Pg 103 of 124
Redirect - Raul Matos by Mr. Hackwelder    Filed 10-27-021

103

Matos - by Plaintiff - Redirect

1          Mr. Zeitlin, what is your objection?

2          MR. ZEITLIN:  There was no objection, I wanted to

3      say I believe the plaintiff --

4          THE COURT:  Believe the what?

5          MR. ZEITLIN:  Plaintiff's counsel put pictures in

6      evidence that he claimed how the guardrail was at the time

7      of the incident, so it's in evidence.

8          THE COURT:  All right.  Whatever your comment is,

9      it's noted.

10         Any redirect?

11         MR. HACKWELDER:  Your Honor, can we have a quick

12     side-bar?

13         THE COURT:  Very quick.

14         (WHEREUPON, a discussion was held off the record,

15             at the side bar, in the presence of the Court and

16             both counsel and out of the hearing of the jury.)

17         MR. HACKWELDER:  Judge, could I have just have a

18     brief redirect?

19         THE COURT:  All right, a brief redirect.  We're

20     going to hold you to it.

21         (Brief pause in the record.)

22         THE COURT:  Times up.

23 REDIRECT EXAMINATION

24 BY MR. HACKWELDER:

25     Q    Mr. Matos, on direct you mentioned that you were the

A.160

D_000530

104
Matos – by Plaintiff – Redirect

1    treasurer of the board.

2        A    Correct.

3        Q    As treasurer would you be aware of whether or not a

4    lessor of the commercial space owed rent?

5        A    Correct.

6                MR. HACKWELDER:  No further questions.

7                THE COURT:  All right.  Any recross based on

8        that?

9                MR. ZEITLIN:  No, Your Honor.

10               THE COURT:  All right, you can step down,

11       Mr. Matos.

12               (Witness exits the witness stand.)

13               THE COURT:  Mr. Hackwelder, any further evidence?

14               MR. HACKWELDER:  No, Your Honor, plaintiff rests.

15       thank you.

16               THE COURT:  Have the medical records been

17       stipulated into evidence, is that it?

18               MR. HACKWELDER:  The medical records are

19       previously admitted.

20               THE COURT:  This record doesn't know that.

21               All right.  So the plaintiff's medical records

22       from some medical institution her e in Manhattan have been

23       marked and received into evidence, am I correct, and you'll

24       be able to consider that, members of the jury.  Is that it?

25               MR. HACKWELDER:  Yes.

Laura L. Ludovico, SCR

A.161

D_000531

Matos - by Plaintiff - Redirect

1              THE COURT:  All right.  I didn't know that.  Do

2       you have a number?

3              MR. HACKWELDER:  Plaintiff's 1.

4              THE COURT:  All right.  Plaintiff rests, so that

5       means, ladies and gentlemen of the jury, that you've heard

6       all of the evidence you're going to hear on behalf of the

7       plaintiff's case.  At this time we generally have motions.

8              You want to reserve your motions at this time?

9              MR. HACKWELDER:  Yes, Your Honor.

10              MR. ZEITLIN:  Yes, Your Honor.

11              THE COURT:  So we'll deal with the legal mumbo

12       jumbo later.

13              At this point, Mr. Zeitlin, do you have any

14       witnesses on behalf of the defense?

15              MR. ZEITLIN:  Yes.  One moment, Your Honor.

16              (Brief pause in the record.)

17              MR. ZEITLIN:  The defense calls the defendant,

18       Steven Hiraldo, to the stand.

19              THE COURT:  All right.  Mr. Hiraldo come on up.

20              (Witness enters the witness stand.)

21              THE COURT:  Remain standing, raise your right

22       hand and face Ms. Crawford to be sworn in.

23  STEVEN HIRALDO, having been first duly sworn, took the witness

24  stand and testified as follows:

25              THE CLERK:  Thank you.

A.162

D_000532

23-01011-jpm   Doc 11-2   Filed 10/27/23   Entered 10/27/23 10:33:02   Exhibit Ex. B
Direct--Stephen Hiraldo. by Mr. Zeitlin Transcript 74 Pg 106 of 124

106
Hiraldo - by Defendant - Direct

1            Please be seated and please state your name and

2      your address for the record.

3            THE WITNESS:  Hello.  Good afternoon, everyone.

4      My name is Steven Hiraldo.  I live currently in 160

5      Claremont Avenue, New York, New York 10027.

6            THE COURT:  Mr. Zeitlin, whenever you're ready.

7   DIRECT EXAMINATION

8   BY MR. ZEITLIN:

9      Q   Good afternoon, Mr. Hiraldo.

10     A   Good afternoon, sir.

11     Q   How old are you, sir?

12     A   I'm 36.

13     Q   What's your marital status?

14     A   Come again, sir.

15     Q   What's your marital status?

16     A   Single.

17     Q   Have you ever been married?

18     A   Yes.

19     Q   Do you have any children?

20     A   No, sir.

21     Q   Now, are you familiar with 161 West 108th Street?

22     A   Yes, I am.

23     Q   What does that address have to do with you?

24     A   I lived there my whole life, 36 years.

25     Q   So you were born there?

Hiraldo – by Defendant – Direct

1    A    Yes, born and raised.

2    Q    Now, right now you're not living at that address?

3    A    No, sir.

4    Q    What is the reason?

5    A    The building is being renovated and all of the

6   residents got relocated, so we're all relocated.  We're going

7   to move back when it's up and running again.

8    Q    And what is your educational status?

9    A    I graduated high school at A Philip Randolph.

10   Q    And are you presently employed?

11   A    Yes, sir.

12   Q    Where do you work?

13   A    I work at a residential building called Mercedes

14  House.

15   Q    What's the address of that building?

16   A    555 West 53rd.

17   Q    And what is your job?

18   A    My job, I am a front desk concierge.

19   Q    And how long have you worked at that building?

20   A    At that site, I've been there ten years.

21   Q    How long have been a concierge?

22   A    Oh man, since I was 18 I would say, close to 20 years.

23  I've worked in numerous buildings.

24   Q    Have you ever been convicted of a crime?

25   A    No.

Hiraldo - by Defendant - Direct

1    Q    Have you ever been sued before?

2    A    No, sir.

3    Q    Now, do you know the plaintiff in this case, Raul

4    Matos?

5    A    Yes, I do.

6    Q    How do you know him?

7    A    We grew up in the same building.  I've known him my

8    whole life.

9    Q    Have you ever had any disagreements with Mr. Matos

10   prior to Christmas of 2015?

11   A    No, sir.  I had no disagreement with him.  He had a

12   disagreement with me one time, but I didn't have a disagreement

13   with him.

14   Q    And when did he have a disagreement with you?

15   A    Well, previous -- prior to the incident I was walking

16   up the stairs from the same picture we've seen and as I was

17   heading to my house he stopped me one day and he just started

18   saying, you got to stop talking about me behind my back.  I was

19   just completely shocked and I didn't know what he was talking

20   about.  I was trying to ask him to tell me who he was talking

21   about, but he was just very aggressive and, you know, I didn't

22   want to fight so I went upstairs and I went home.

23   Q    Had you ever talked badly about him to anybody?

24   A    I'm sorry?

25   Q    Had you ever spoken badly about Mr. Matos?

Laura L. Ludovico, SCR
A.165
D_000535

Hiraldo - by Defendant - Direct

```
 1      A    No.

 2      Q    At 161 West 108th Street, what apartment did you live

 3   in when you were -- in Christmas of 2015?

 4      A    At Apartment 3S as in Sam.

 5      Q    And who did you live there with?

 6      A    My grandmother.

 7      Q    How old was she at the time?

 8      A    At the time, 96.

 9      Q    Did any other family members live in that building?

10      A    Yes, sir.

11      Q    Who lived in the building also?

12      A    My parents.  They have another unit in the building.

13      Q    What unit do they live in?

14      A    They live in apartment 4R as in Robert.

15      Q    Does anybody else live in their apartment?

16      A    Yes, my sister Catherine.

17      Q    Now, I'm going to call your attention to Christmas Eve

18   of 2015.  That would be December 24th.  Do you remember what

19   you did that day when you woke up?

20      A    Yes, sir.  I woke up, regular day, and my shift was

21   one to ten at the time.  So I just got up a little late and a

22   little easy and just got ready, went straight to work and I

23   just did a regular shift, one to ten.

24      Q    When you say "a regular shift," you were working as a

25   concierge?
```

Hiraldo – by Defendant – Direct

1    A    As a concierge.

2    Q    At 10:00 you were off duty?

3    A    Yes, my shift was done at ten.

4    Q    Did anything unusual happen that day?

5    A    No.

6    Q    When you left work at 10:00, where did you go?

7    A    Straight home.

8    Q    And how did you get home?

9    A    I took the bus.

10   Q    And when you got home, do you recall what you did?

11   A    I got home, I just showered.  It was Christmas Eve and

12   what I did, I just went up to my parents' house, they had some

13   dinner there and we just had some dinner and a little family

14   time.  By that time it was like close to midnight, so they just

15   went to bed.

16   Q    Did you have anything to drink that day?

17   A    Yes, I did.

18   Q    What did you drink?

19   A    I had a beer with my dad.

20   Q    Now, did you go to any bars that day?

21   A    Any bars?  No, sir.

22   Q    Any parties?

23   A    Parties?  No, sir.

24   Q    Okay.  Did there come a time that you went downstairs

25   from your apartment to be on the front stoop of the building?

Hiraldo – by Defendant – Direct

1    A    Yes, I was by myself at home.  It was getting a little

2    boring, so I just wanted to go outside and get some fresh air.

3    Q    Now, when you went outside to get fresh air, tell the

4    jury what, if anything, happened.

5    A    I went outside.  My friend Elaine was right in the

6    front.  She's also a neighbor in the building, a resident in

7    the building.  So we were talking.  She was talking to another

8    gentleman from the neighborhood, his name is Freddy.  They're

9    both talking.  So we start having a very pleasant conversation.

10   A few minutes in the conversation Raul Matos comes out of his

11   party from the side door, walks towards us and so now he's in

12   the bottom of the stairs right next to Freddy.

13        I remember at the time, you know, we were talking

14   about how lucky we were.  You know, it's Christmas Eve, you

15   know, we felt good.  And Raul tells me, what are you lucky

16   about, because your mom's stealing?  So I said, you know, who's

17   talking to you?  You know, you're not even in this

18   conversation.  So he comes up the stairs -- he comes up the

19   stairs and gets in my face.  He's a foot away from my face.  He

20   just said that.  He's moving his hands and he's just talking

21   about how my mom stole money from the building.  I was like,

22   dude, you know, I could smell the alcohol and marijuana, like,

23   you know, back off, you got your hands in my face.

24        Right there in that same moment he mushes my face with

25   his hand.

Hiraldo - by Defendant - Direct

1    Q    And when you say he mushes your face, tell the jury

2  what you mean.

3    A    Well, a slap is like a -- he like punches me with his

4  hand open, he mushes my face in.

5    Q    And then he punched you right in the face?

6    A    I'm on the stoop so I'm right in front of the door, so

7  when he does that, I literally hit my head on the door.  My

8  instinctive reaction, and this is not me -- my instinctive

9  reaction was just to punch him, so I punched him one time.  He

10 staggered back a little bit, but he I was still intact, he was

11 still on the platform, he was still standing.  And then he just

12 rushed me.  He started swinging punches.

13        You know, I didn't want to get into a brawl with him.

14 So he's swinging punches at me, so I'm blocking the punches.

15 He's swinging a lot and he was talking a lot and, you know,

16 people come out from the party and they were from the

17 neighborhood.  There were people there. you know, people

18 don't --

19   Q    And while he's swinging and you were blocking the

20 punches, what happened then?

21   A    You know, I'm blocking the punches, people come out

22 and they start pulling him down.  They tried to separate him

23 because he has the Hulk in him, so they try to separate him.  I

24 didn't want to fight, you know --

25   Q    Did you see what happened to Mr. Matos?

113

Hiraldo – by Defendant – Direct

1    A    Yes.  Well, they pull him down the stairs.  It's one

2    of those situations, ladies and gentlemen --

3                THE COURT:  No, there are no editorial comments.

4                THE WITNESS:  Sorry, Your Honor.

5    A    It's one of those situations where the more they pull

6    you back, the more you want to move forward.  So they're

7    pulling him down the stairs.  At some point he tried to come up

8    the stairs and he tripped.  You know, they kept trying to

9    contain him, they're trying to pull him back.

10               I saw my mom.  My mom must have came down from the

11   noise and I just decided, you know, I want to go home and, you

12   know, that's it really.

13   Q    Mr. Hiraldo, I'm going to show you --

14   A    Yes, sir.

15   Q    I'm going to show you this picture.  Can you describe

16   what Defendant's -- this is Defendant's A.

17   A    Okay.

18   Q    Could you show the jury exactly where you were?  I

19   assume at the time this bag was not on the porch, right?

20   A    Not, the bag wasn't there, no.

21   Q    And this white stuff, this elevator --

22   A    That's new because that picture is from the -- like I

23   said, the building is being renovated, so that's the only part

24   that's new and like the gentleman mentioned --

25   Q    Would I be fair in stating that the platform was the

Hiraldo - by Defendant - Direct

1    same size it was on December 25th?

2        A    Yes.

3        Q    And it's the same door?

4        A    Same door, correct.

5        Q    And I'm pointing to this door.  Is that the same door

6    from the community space?

7        A    Yes, sir.

8        Q    So when Mr. Matos, you testified, came out of this

9    door --

10       A    Yes.

11       Q    -- what did he do?

12       A    He came straight towards us.

13       Q    He walked over to the other landing?

14       A    He came right -- exactly.  Where the stairs begins,

15   that's where Freddy is standing, right at the bottom there and

16   he's talking to Elaine and so Raul comes out of the commercial

17   space.  He's feeling a little happy.  He comes towards us.

18   He's standing right next to Freddy Gomez.  Like I said, we're

19   having a conversation, very pleasant.  You know, we're talking

20   about how we're lucky and that's when he tells me like, you

21   know, what are you lucky about, because your mom's stealing --

22       Q    All right.  When he first tells you what are lucky

23   about, was he on the bottom of the staircase or --

24       A    Right next to --

25       Q    -- where was he?

Laura L. Ludovico, SCR

A.171

D_000541

Hiraldo - by Defendant - Direct

1    A    No, he was at the bottom of the still with Freddy.

2    Q    When did he come up the stairs towards you?

3    A    Sorry?

4    Q    When did he come up the stairs?

5    A    Well, when I told him, I said, who's talking to you,

6    you know, you're not in this conversation.

7    Q    And after you said that, that's when he came up the

8    stairs?

9    A    He came up the stairs to my face, yes, sir.

10   Q    And when he came up the stairs, that's when he mushed

11   you?

12   A    He got into my face and he's trying to explain to me

13   how my mother is stealing money from the building while he's

14   moving his hands and I felt -- you know, I --

15   Q    How long was it from the time he up the stairs moving

16   his hands talking about your mother before he mushed you?

17   A    I would say seconds, maybe like, you know, I don't

18   know, 15 seconds.

19   Q    And as soon as he mushed you, you reacted and you

20   punched him?

21   A    Immediately, yes.

22   Q    Is that the only time you hit him?

23   A    Yes, sir, one time.

24   Q    How many times did he hit you?

25   A    Twenty punches.

Hiraldo - by Defendant - Direct

1    Q    Did he do any damage to you, did you have any

2  injuries?

3    A    No, no, I had no injuries.

4    Q    But would I be fair in stating that most of the

5  punches you blocked?

6    A    Yes, sir.  He probably got one or two, but like I

7  said, you know, I didn't want to fight him.

8    Q    Did you ever sucker punch him, as he testified?

9    A    Absolutely not, absolutely not.  Never done that in my

10 life.

11   Q    Did Elaine Candelario try to get between the two of

12 you and grab him?

13   A    Yes, she was trying to stop it, you know?  You know,

14 she was trying to stop it, you know?  In fact, when he was in

15 my face, she was like, that's it, let it go.  She was telling

16 him this.

17   Q    After you punched him is that when Elaine Candelario

18 grabbed him?

19   A    No.  He started throwing punches at me --

20   Q    Listen to the question.

21   A    Sorry.

22   Q    When did Elaine Candelario grab Mr. Matos, before you

23 punched him or after you punched him?

24   A    Let me correct.  She intervened verbally.  She didn't

25 physically grab him at any point.

Hiraldo - by Defendant - Direct

1    Q     Did anybody grab him?  You said people held him back?

2    A     Yes, there were men that came out of the commercial

3    space.  They saw the fight escalating and --

4    Q     Do you know who those men were?

5    A     I know them by face.  They're from the neighborhood.

6    I don't know them by the name, but, yes, I do know them.

7    Q     Is Mr. Matos on the board of the building?

8    A     Mr. Matos was a secretary.  He was on the board.

9    Every resident in the building has gotten an opportunity to be

10   on that board.  It's not like a very serious thing.

11   Q     Has anyone in your family ever been on the board?

12   A     Yes, my mom was president of the tenant's association

13   for many years.

14   Q     How many years?

15   A     She actually formed the tenant's association like in

16   the late eighties and this whole process that he mentioned is

17   actually going through because of her.

18         You know, there was a time when Columbia University

19   was buying a lot of buildings and --

20              THE COURT:  Very interesting.  Wait for the next

21   question.

22              THE WITNESS:  Sorry, Your Honor.

23              MR. ZEITLIN:  I have no further questions.

24              THE COURT:  Any cross-examination.

25              MR. HACKWELDER:  Yes, Your Honor.

23-01011-jpm    Doc 11-2    Filed 10/27/23    Entered 10/27/23 10:33:02    Exhibit Ex. B
Cross--Stephen Hiraldo by Mr. Hackwelder (p. A_175-021)
- Trial Transcript    Pg 118 of 124

118

Hiraldo – by Defendant – Cross

```
 1   CROSS-EXAMINATION

 2   BY MR. HACKWELDER:

 3        Q    Mr. Hiraldo?

 4        A    Yes, hello, sir.  Good afternoon.

 5        Q    Freddy Gomez is a friend of yours, correct?

 6        A    No, no, he's from the neighborhood.  He's just someone

 7   that we all know from the same neighborhood.  When I say

 8   "friends," it's like a person we know from the neighborhood.

 9   Like, you're my friend.

10        Q    Well, when you were at your deposition you described

11   him as a friend, true?

12        A    That's true.  That's a common statement.  I didn't say

13   he's my best friend or --

14        Q    Sir, sir, sir, I'm asking yes or no questions.

15             MR. ZEITLIN:  Objection, Your Honor.

16   BY MR. HACKWELDER:

17        Q    If you can't answer yes or no, just say you can't

18   answer it yes or no, otherwise, just give a yes or no.

19        A    I'm very sorry about this.

20        Q    You've already had a chance to go at length with your

21   attorney.

22             At your deposition did you describe Freddy Gomez as a

23   friend?

24        A    Yes.

25        Q    And you described Elaine Candelario as a friend?
```

Hiraldo – by Defendant – Cross

1    A    Yes.

2    Q    Now, it's your testimony that Freddy Gomez was

3    standing at the bottom of the steps before Mr. Matos came out,

4    correct?

5    A    Correct, sir.

6    Q    And Mr. Matos, in order to get to you, had to pass by

7    Mr. Gomez, correct?

8    A    He was right next to me, yes.

9    Q    Mr. Matos had to pass Mr. Gomez in order to climb the

10   steps, correct?

11   A    Correct, yes.

12   Q    So at this time he's yelling at you and there's a

13   conversation and argument going on and he has to pass by

14   Mr. Gomez, correct?

15   A    He passed by Mr. Gomez.

16   Q    It's your testimony that he was being aggressive at

17   that point, correct?

18   A    Yes, sir, correct.

19   Q    Mr. Gomez did nothing to stop him, correct?

20   A    No.

21   Q    And all that time that Mr. Matos was mushing you in

22   the face and throwing 20 punches that you blocked most of,

23   Mr. Gomez did nothing to break that fight up?

24   A    Why would he get involved?  People don't do that.

25   Q    Sir, I'm asking you a yes or no question.

Hiraldo - by Defendant - Cross

1    A    No.

2    Q    If you can say yes or no -- if you can't answer, just

3  say you can't answer it.

4    A    No, sir.

5    Q    So Mr. Gomez just sat and let Mr. Matos wail away at

6  you, correct?

7    A    Correct.

8    Q    Where did you learn to block all of those punches?

9    A    Come again.

10   Q    Where did you learn how to block all of those punches?

11   A    My dad had a karate school.  I do karate for many

12  years.

13   Q    Are you a black belt?

14   A    Yes, sir.  Yes, karate school for kids, a community

15  center.

16        MR. HACKWELDER:  Your Honor, I have no further

17     questions.

18        (Brief pause in the record.)

19        MR. HACKWELDER:  Oh, I have one further question,

20     Your Honor.

21  BY MR. HACKWELDER:

22   Q    You never mentioned that Mr. Matos smelled like

23  marijuana at your deposition, correct?

24   A    I didn't.  Are you sure?

25   Q    Do you want to take a look?  There's an index in the

Hiraldo – by Defendant – Cross

1    back of this book.

2        A    I'm very sorry.  I'm sure I did.  I'm very sorry.

3        Q    Okay.  Why don't you take a look at the index and see

4    where the word marijuana is in the index?

5                THE COURT:  Inappropriate use of a deposition.

6        Just ask your questions.

7                MR. HACKWELDER:  No further questions, Your

8        Honor.

9                THE WITNESS:  Thank you, sir.

10               MR. ZEITLIN:  Can I have a moment for possible

11       redirect?

12               THE COURT:  Sure.

13               (Brief pause in the record.)

14               MR. ZEITLIN:  I have no further questions.

15               THE COURT:  All right.  You can step down

16       Mr. Hiraldo.

17               THE WITNESS:  Thank you, Your Honor.

18               (Witness exits the witness stand.)

19               THE COURT:  Members of the jury, as you may have

20       heard me mention earlier, after the plaintiff's case

21       there's an opportunity for what's known as legal motions to

22       be heard regarding the case after the end of entire case.

23               Well, let me just ask.  Mr. Zeitlin, does the

24       defendant rest?

25               MR. ZEITLIN:  Yes, Your Honor.

Hiraldo - by Defendant - Cross

1           THE COURT:  So the defendant has rested.  You've

2     heard all of the evidence you're going to hear, so now

3     is the time that I have to address certain motions with

4     the attorneys and I also have to discuss with them the

5     appropriate law to charge you on that will be on Monday

6     because they don't trust me to figure it out myself, so

7     I discuss that with them, it takes some time.  It's now

8     4:20, so I'm going to release you for the day and ask you

9     to come back Monday morning at 10:00 where the officer

10    tells you.

11          Please remember the Court's admonitions; don't

12    discuss the case with anybody, don't do any research.  You

13    now know the location where this event occurred.  Please

14    don't go to that location, all right?  So we'll see

15    everybody Monday morning at 10:00.  I'm confident the case

16    will be in your hands on Monday.

17          THE COURT OFFICER:  All rise, please.

18          (Jurors exited the courtroom.)

19          THE COURT:  Are we ready for motions?

20    Mr. Zeitlin, do you have motions at this time?

21          MR. ZEITLIN:  I move to dismiss after both the

22    People's case and the entire case on the grounds that the

23    plaintiff has not presented a case as a matter of law.

24          THE COURT:  Mr. Hackwelder?

25          MR. HACKWELDER:  I don't know what the basis is

Laura L. Lodovico, SCR    A.179    D_000549

Hiraldo - by Defendant - Cross

1   for that.

2           THE COURT:  All right.  Well, there's obviously

3   been testimony from both parties that they have been struck

4   by the other, so the motion is denied.

5           Any other motions at this time before we continue

6   to discuss the jury change and the verdict sheet, which we

7   will do off the record?

8           MR. HACKWELDER:  No, Your Honor.  I think

9   everything that I've wanted to bring up, we talked about

10  the objections beforehand.  I thought, you know, with all

11  the testimony Mr. Zeitlin elicited about the mother

12  stealing money and all of this, that I should have been

13  allowed to have my client comment on it, but I already made

14  that objection.

15          THE COURT:  All right.

16          MR. ZEITLIN:  We already made all the

17  objections and discussions on the law before we started the

18  trial.

19          THE COURT:  Okay.  So it sounds like there's

20  nothing else for the record at this time.  We will do the

21  official pre-charge conference Monday morning.  It

22  shouldn't take more than ten minutes.  Of course, we're

23  going to discuss it now to get everything lined up and

24  we'll do summations and charge on Monday.

25          MR. ZEITLIN:  10:00 Monday, Judge?

Hiraldo – by Defendant – Cross

1          THE COURT:  Yes, 10:00 Monday.

2          (WHEREUPON, court is recessed and the case

3     adjourned to Monday, September 27, 2021 at 10:00

4     a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25